IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 31601-7-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| FRANK GABRIEL LAZCANO, | ) | PUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

FEARING, J. — After Frank Lazcano pled guilty to criminal trespass, the State,

supported by new evidence, charged and convicted Lazcano with first degree felony

murder based on the same events giving rise to the trespass conviction. On appeal,

Lazcano argues this second prosecution placed him in double jeopardy. We address

whether Lazcano asserted a double jeopardy argument below, and, if not, whether he can

raise the defense for the first time on appeal. We find that Frank Lazcano did not raise

the issue before the trial court, and we decline to address the double jeopardy argument

because of a lack of manifest error. The record lacks sufficient facts to review whether

double jeopardy applies, and thus Lazcano fails to show manifest error. We reject on

their merits other arguments of Frank Lazcano and affirm his conviction.

FACTS

This prosecution arises from the shooting death of Marcus Schur, on December 27, 2011, by Frank Lazcano's brother, Daniel Lazcano. Schur previously stole guns owned by Daniel.

In December 2011, Marcus Schur and his brother, David Cramer, burgled Ben Evensen's home in Rosalia and stole personal property, including two rifles belonging to Evensen's roommate, Daniel Lazcano. Rosalia, in the heart of fertile, pastoral Palouse country, is an agricultural community of 500 people lying in Whitman County just south of the border with Spokane County. Evensen resided at the Whitman County jail at the time of the theft. Frank Lazcano occasionally stayed at Evensen's house, and he stored belongings there.

On December 16, 2011, Frank Lazcano visited Ben Evensen's house and discovered personal property missing. After Frank confirmed, with his brother Daniel, his suspicions that someone burgled Evensen's house, the siblings visited Evensen's mother, Susan Consiglio, and told her about the theft. Frank suspected that Marcus Schur stole the chattels because, "Marcus is a thief." Report of Proceedings (RP) at 780. Frank entreated Consiglio to broadcast that the thief must return the filched guns.

After meeting with Susan Consiglio, Frank and Daniel Lazcano searched for Marcus Schur at the Malden house of Schur's ex-wife, Ambrosia Jones. Malden is a

2

town of 200 people five miles west of Rosalia. Frank warned Jones that he would kill Schur if he learned that Schur participated in the Evensen burglary. As his brother threatened Schur, Daniel cried because of his missing guns.

Once the brothers Lazcano departed Ambrosia Jones' abode, Jones traveled to the house down the street where Marcus Schur and David Cramer hid. Jones warned Schur and Cramer of the anger of the Lazcanos. In turn, Schur and Cramer returned Daniel Lazcano's guns. The next day, Susan Consiglio revisited Ben Evensen's home and found Daniel's stolen guns in Evensen's backyard. Consiglio phoned Marcus Schur later that day, and Schur confessed to the theft.

On December 27, 2011, Susan Consiglio informed Daniel Lazcano that Marcus Schur was at Nick Backman's house in Malden. Daniel asked Frank to travel with him to Backman's house to repossess possessions from Schur, and Frank agreed. The brothers drove to Backman's house in a white Ford Escort sedan, owned by the brothers' step-father, Eli Lindsey. Frank later testified that he observed no weapon in the Escort while they drove. Upon arriving at Backman's residence, Frank exited the car in front of Backman's house, and Daniel drove to the back of the home. Daniel's actions surprised Frank since Frank earlier told Daniel to "[h]ang tight." RP at 790.

As the Lazcano brothers arrived at the Backman abode, Nick Backman, Marcus Schur, David Cramer, and Ambrosia Jones prepared for dinner inside the residence. Frank Lazcano knocked on the door, and Cramer answered the knock. At trial, Frank

3

testified that, upon the front door's opening, he saw Backman inside and Backman nodded to him to enter. Frank and Backman knew each other, and Frank had visited Backman at his home before. Nick Backman testified that he stood in the kitchen when Frank entered and gave no nod. Frank asked Cramer, "Are you David?" RP at 791. According to Cramer, he responded in the affirmative, after which Frank swung the porch door open and punched him two to three times in the face. Frank testified that Cramer reached in his pocket for a knife, and Frank struck Cramer once in the face in self-defense. Marcus Schur scurried out the back door of the Backman house into the dark and wet evening, and Frank sprinted after him.

Frank Lazcano saw Marcus Schur run around a garage and into the alley behind Nick Backman's house. As Frank entered the alley, he heard shots. Two bullets sprayed the ground in front of Frank, and he turned to see his brother Daniel holding an AK-47 and shooting in the direction that Schur ran. Nick Backman's neighbor, James Wendt, heard the shots and called 911. David Cramer, who followed Frank outside, saw flares from the shots, raced back inside the house, and told Backman to call 911. Cramer did not see a gun in Frank's hand.

Frank Lazcano ran further down the alley. He heard "thrashing" and found Marcus Schur writhing in pain in shrubbery within the alley. Frank lingered with Schur while the latter gasped for air. Schur died within minutes of being shot.

Daniel Lazcano retrieved the Ford Escort. The brothers Lazcano lifted Marcus

4

Schur's corpse into the car's trunk. Frank drove from the scene with Daniel as a passenger in the Escort. Daniel said "gun" and Frank realized Daniel left the gun on the street. RP at 806. Frank reversed the car, and Daniel retrieved the gun. Frank drove to the Pine City home of his uncle, Travis Carlon, and asked Carlon for advice. Pine City is a diminutive community three miles southwest of Malden. Frank told Carlon he had "Marcus in the trunk of the car with a hole in him." "What?" inquired Carlon. Frank replied: "Don't make me say it again." RP at 809. Carlon declared: "Let me put some boots on." RP at 412.

Travis Carlon told Frank and Daniel Lazcano to meet him outside town. Carlon drove his Cadillac with Frank and Daniel following in the white sedan. The two vehicles journeyed west beyond Pine City to a rural area known as "Hole-In-The-Ground." Carlon directed his nephews to competently dispose of the cadaver because, according to the amateur attorney, "[w]ithout a body, there wasn't a homicide." RP at 417. Frank placed the AK-47 in the trunk of Carlon's Cadillac, and Carlon returned to Pine City. Frank and Daniel drug Marcus Schur's body and sunk it into a creek adjacent to Hole-In-the-Ground-Road. The two bound Schur's limbs to his torso with his clothes and piled rocks on the corpse to keep it from floating to the surface of the stream. After depositing Schur's body, the brothers Lazcano maneuvered back roads in the Ford Escort to McKyndree Rogers' residence in Spokane. Rogers was Daniel Lazcano's girlfriend. Spokane is a major city in Spokane County 33 miles north of Rosalia.

5

Travis Carlon returned to his Pine City house, but stopped along the route to set the AK-47 against a fence post. Upon arriving home, Carlon asked Frank Lazcano's girlfriend, Jamie Whitney, to drive him to a cigarette store. During the drive, Carlon told Whitney that Daniel shot Marcus Schur and Whitney must drive McKyndree Rogers home to Spokane. Carlon also told Whitney to instruct Frank and Daniel Lazcano, upon her arrival at Rogers' home, to destroy the Ford Escort.

After returning from the store, Travis Carlon called Frank and Daniel Lazcano's step-father, Eli Lindsey, and told him the police were searching for Frank because he punched someone. Carlon asked Lindsey to retrieve him from his house. Lindsey arrived at Carlon's residence around 11:30 p.m. Carlon entered Lindsey's truck and directed him to the fence post where the AK-47 rested. Carlon retrieved the assault rifle and the two men journeyed to McKyndree Rogers' house in Spokane. During the trip, Carlon threw the rifle into the Spokane River as the two drove across a bridge near Spokane Falls Community College.

Jamie Whitney and McKyndree Rogers arrived at Rogers' Spokane house before Frank and Daniel Lazcano appeared. When the Lazcano brothers arrived, Jamie Whitney told Frank that Travis Carlon wanted him to destroy the white Ford Escort. Frank agreed. Whitney and he drove in separate cars to Nine Mile Falls, a scenic community straddling Stevens and Spokane Counties ten miles north of Spokane. Frank piloted the Escort into the woods and ignited the car. Whitney and Frank then returned to Pine City. Frank

6

instructed Whitney to claim she picked him up on Route 195 if anyone asked her about the Ford Escort.

Anita Schmidt, a resident of Nine Mile Falls, noticed the fire at 12:30 a.m., December 28, and called 911. Firefighters arrived ten minutes later and doused the Escort. On January 3, 2012, Washington State Patrol Trooper Brad Osmonovich ascertained, through the car's vehicle identification number, that Eli Lindsey owned the charred car.

Meanwhile during the evening hours on December 27, Whitman County Sheriff Sergeant Rick McNannay, Deputy Tim Cox, and Deputy Brown arrived at Nick Backman's home. David Cramer told Deputy Cox that Marcus Schur ran away and he did not know his location. After the three law enforcement officers spoke with Nick Backman, Ambrosia Jones, and Cramer, they hunted for Marcus Schur. The deputies searched the area where witnesses heard rifle shots, but they found no blood or shell casings.

Deputy Cox spoke with James Wendt and Becky Varner, Backman's neighbors, who disclosed seeing a white car in the alley leave after they heard gunshots. Wendt advised that he saw a driver and a passenger in the white car, and he observed the two deposit a long object in the back seat. Varner claimed that she saw people running around the white car, and the people loaded "something big" into the trunk before driving away. Varner also watched the car reverse fast, a person exit from the car, grab a long

7

device, and hurriedly return to the car. After speaking to Wendt and Varner, Sheriff Deputies Cox and Brown traveled to Pine City and spoke with Travis Carlon, who said he did not know where Frank Lazcano was.

At 3:35 on the morning of December 28, 2011, Frank Lazcano reported to the Whitman County Sheriff's office in Colfax twenty-seven miles south of Rosalia. Colfax is the county seat. Deputy Tim Cox traveled to Colfax to interview Frank. Deputy Cox recorded an interview of Frank, during which Frank remarked that he went to Nick Backman's home alone on an anonymous tip that the gentleman who stole from his friends and him could be found there. Frank insisted he was unarmed and he chased Marcus Schur from Backman's house, but left the area after he heard shots fired, in the alley, at Schur. Frank commented that he left Backman's property in the white Ford Escort; the Escort failed in Cheney; and his girlfriend retrieved him after he called her from the Tidyman's store in Cheney. Tim Cox told Frank he disbelieved Frank's story. Cox arrested Frank at the end of the interview.

Whitman County Sheriff Deputy Tim Cox spoke with Daniel Lazcano during the evening of December 29, 2011. Daniel denied being present at Nick Backman's house on December 27. Daniel insisted that he took Frank to Frank's girlfriend's house in Spokane on the afternoon of December 27 and that Frank traveled alone to Backman's residence. Daniel denied participating in any shooting of Marcus Schur, but admitted to driving a white car.

Between December 29, 2011, and January 2, 2012, Deputy Tim Cox spoke with many witnesses. McKyndree Rogers provided an alibi for Daniel Lazcano. Rhonda Ruff, Marcus Schur's ex-girlfriend, stated she had no contact from Schur. Grace Schur, Marcus's mother, also commented that she had not heard from Marcus. Jamie Whitney corroborated Frank's story about the white Ford Escort malfunctioning in Cheney. After a week of investigation, Deputy Cox closed the case "pending any additional information obtained from Marcus Schur once he is located." CP at 36. Cox also noted that Schur had an active Department of Correction's warrant.

On January 3, 2012, the State of Washington charged Frank Lazcano with residential burglary and fourth degree assault for his entry into Nick Backman's home on December 27. On March 9, 2012, pursuant to a plea agreement, Frank pled guilty to a reduced charge of criminal trespass in the first degree in violation of RCW 9A.52.070(1). On March 9, the trial court sentenced Frank to 90 days in jail, with 89 days suspended and credit for one day served on his initial arrest.

On March 25, 2012, a bystander found Marcus Schur's corpse floating in the creek at Hole-In-The-Ground. Law enforcement officers found bullet holes in Schur's left shoulder and his lower abdomen.

PROCEDURE

On March 31, 2012, three weeks after Frank Lazcano's sentencing for trespass, law enforcement arrested Lazcano for the murder of Marcus Schur. On January 11,

9

2013, after two amendments to the information, the State of Washington charged Frank with first degree murder with a firearm enhancement, unlawful disposal of human remains, and kidnapping in the first degree with a firearm enhancement. The State also charged Daniel Lazcano with first degree murder. The State alleged Frank committed first degree murder under the alternative theories of (1) premediated murder, or (2) felony murder based on the predicate offenses of: (a) robbery in the first or second degree, (b) burglary in the first degree, or (c) kidnapping in the first or second degree.

Before trial, Frank Lazcano moved in limine to exclude all testimony and argument that he committed first degree burglary on December 27, 2011 in the home of Nicholas Backman, and all testimony and argument that he assaulted David Schur or Ambrosia Jones in the home of Nicholas Backman on December 27, 2011. Frank argued that the doctrine of collateral estoppel and the terms of his March 9, 2012 plea agreement precluded the State from asserting that his actions on December 27, 2011 constituted first degree burglary, because he pled to, and had been convicted of, first degree criminal trespass based on the same incident. In his written motion and memorandum, Frank did not assert a double jeopardy defense. During oral argument in support of the motion in limine, Frank contended that a claim of double jeopardy was not yet ripe because a jury had yet to be empaneled for the murder trial, but that a double jeopardy defense was relevant and related to his collateral estoppel argument.

The trial court denied Frank Lazcano's motion in limine and allowed the State to

10

allege burglary as a predicate offense to felony murder. The trial court ruled that the State did not breach the plea agreement, since the State had not promised to refrain from bringing unknown charges. The trial court also ruled that collateral estoppel did not apply. The trial court commented:

> From the instant I became aware . . . [of] the fact that Mr. Lazcano was facing first-degree murder based on premeditated murder, first-degree murder based upon felony murder with the predicate offense of burglary, having known . . . about the facts from his previous arrest and guilty plea, the thing that jumped out at me was how is the felony murder allegation not barred by double jeopardy?
>
> Now, today the argument is not totally double jeopardy, it's a subset of that, collateral estoppel. What the defense is trying to do is preclude the admission of evidence relating to a burglary at Mr. Backman's house on the 27th of December 2011 and to preclude evidence of an assault.

Report of Proceedings (RP) (Feb. 22, 2013) at 37-38.

The trial court analyzed the four elements of collateral estoppel before denying Frank Lazcano's motion. The trial court found elements one, two, and three of collateral estoppel present. The previous prosecution involved a privity of parties, identical issues, and a final judgment. With the knowledge possessed by the State at the time of the earlier plea, the State had evidence to charge Frank Lazcano with burglary, the crime on which felony murder was now based in part. The trial court found element four of collateral estoppel lacking, since application of the doctrine of collateral estoppel would work an injustice against the State. Although the State could have earlier charged burglary, the State did not have grounds to charge murder because of the lack of a dead

11

body, the absence of blood and casings in the alley, and the belief that Marcus Schur may be hiding or on a methamphetamine binge. The court did not address the applicability of double jeopardy. Frank Lazcano did not raise a defense of double jeopardy after empaneling the jury.

At trial, the prosecution elicited the following testimony from Deputy Tim Cox about Daniel Lazcano's statements to him during Cox's questioning of Lazcano in the course of the criminal investigation. The testimony is the subject of a confrontation clause challenge from Frank Lazcano.

> Q. Did you ask him if he knew why Frank went to the house?
> A. Yes.
> Q. What was his response?
>     MR. MARTONICK: Objection. Hearsay.
>     MR. LEBEAU: It's not going to the truth of the matter asserted, Your Honor.
>     THE COURT: Okay. Members of the jury, I am going to overrule the objection, allow the answer to this question. But I'm only allowing it so it can be considered by you for a limited purpose. That purpose is to show the knowledge of Frank and Dan Lazcano, and intent that they might have had. So.
> Q. (By Mr. LeBeau) Did Dan tell you that he knew why Frank went to Malden?
> A. Yes.
> Q. And what was his—what did he tell you?
> A. I believe it was to retrieve his belongings.
> Q. Dan's belongings, or Frank's?
> A. Frank's.
> Q. Okay. Did you ask him if he knew who was there with Frank?
> A. Yes.
> Q. And what was his response?
> A. He was not there.
> Q. That he wasn't in Malden at all?

A. Right.

RP at 375-76.

During trial, the State called Daniel Lazcano as a witness, and Daniel invoked his right to remain silent, leading the court to rule him an unavailable witness. Frank Lazcano testified that he was at Nick Backman's house, and that he went there for the purpose of retrieving the goods stolen from Daniel and him.

After a five-day trial, the trial court instructed the jury on Frank Lazcano's felony murder charge. An instruction permitted burglary as the only predicate offense upon which felony murder could be found.

The jury found Frank Lazcano guilty of first degree murder while armed with a firearm, guilty of unlawful disposal of human remains, and not guilty of kidnapping. In a special verdict, the jury disclosed that it found guilt of first degree murder based on a felony murder, but not on premeditated murder. The trial court convicted and sentenced Frank to 300 months of confinement. Frank appeals his conviction for felony murder.

## LAW AND ANALYSIS

*Issue 1: Did Frank Lazcano raise the argument of double jeopardy before the trial court?*

*Answer 1: No.*

Frank Lazcano contends that his conviction for felony murder placed him twice in jeopardy for the same offense. The jury could have used robbery as the predicate crime

on which to base the conviction. Therefore, he asks this court to reverse his conviction for first degree felony murder as barred by the constitutional protection against double jeopardy. Lazcano argues that criminal trespass in the first degree is a lesser included offense of first degree burglary, and therefore the State should have been barred from alleging first degree burglary as a predicate for felony murder. In addition, Lazcano argues that the State did not exercise due diligence in investigating the death of Marcus Schur and potential charges against him, and therefore the *Diaz* exception to double jeopardy articulated in *Brown v. Ohio*, 432 U.S. 161, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977), does not apply. Lazcano does not raise the contention that collateral estoppel barred a prosecution for felony murder based on burglary.

Generally, this court refuses to address arguments on appeal not asserted by the appellant before the trial court. RAP 2.5(a). Before determining whether to apply this rule of review, we first scan the trial court record to ascertain whether Frank Lazcano asserted double jeopardy as a defense at the trial court level. We conclude Lazcano did not raise the issue below, or at least did not sufficiently raise the issue.

Frank Lazcano mentioned double jeopardy in his argument to prevent the State from introducing evidence of a burglary in support of the felony murder charge. But he informed the trial court that the double jeopardy bar did not apply until empanelment of the jury. He never raised the contention after empanelment. In arguing a bar to evidence of burglary, he relied only on collateral estoppel.

14

A party may not generally raise a new argument on appeal that the party did not present to the trial court. *State v. McFarland*, 127 Wn.2d 322, 333, 899 P.2d 1251 (1995); *State v. O'Hara*, 167 Wn.2d 91, 97-98, 217 P.3d 756 (2009). A party must inform the court of the rules of law it wishes the court to apply and afford the trial court an opportunity to correct any error. *Smith v. Shannon*, 100 Wn.2d 26, 37, 666 P.2d 351 (1983); *State v. O'Hara*, 167 Wn.2d at 98. We may decline to consider an issue that was inadequately argued below. *Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett*, 146 Wn.2d 29, 36-37, 42 P.3d 1265 (2002); *Mid Mountain Contractors, Inc. v. Dep't of Labor & Indus.*, 136 Wn. App. 1, 8, 146 P.3d 1212 (2006). To be adequate for appellate review, the argument should be more than fleeting. This court will not consider an issue in the absence of "adequate argument." *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 203, 11 P.3d 762 (2000), 27 P.3d 608 (2001).

*Issue 2: Should we review Frank Lazcano's double jeopardy argument on the ground of manifest error affecting a constitutional right under RAP 2.5(a)(3)?*

*Answer 2: No. The record does not permit adequate review to determine if the* Diaz *exception applies.*

RAP 2.5(a) formalizes a fundamental principle of appellate review. The first sentence of the rule reads:

> **(a) Errors Raised for First Time on Review.** The appellate court may refuse to review any claim of error which was not raised in the trial court.

No procedural principle is more familiar than that a constitutional right, or a right of any other sort, may be forfeited in criminal cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it. *United States v. Olano*, 507 U.S. 725, 731, 113 S. Ct. 1770, 123 L. Ed. 2d 508 (1993); *Yakus v. United States*, 321 U.S. 414, 444, 64 S. Ct. 660, 88 L. Ed. 834 (1944).

Good sense lies behind the requirement that arguments be first asserted at trial. The prerequisite affords the trial court an opportunity to rule correctly on a matter before it can be presented on appeal. *State v. Strine*, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013). There is great potential for abuse when a party does not raise an issue below because a party so situated could simply lie back, not allowing the trial court to avoid the potential prejudice, gamble on the verdict, and then seek a new trial on appeal. *State v. Weber*, 159 Wn.2d 252, 271-72, 149 P.3d 646 (2006); *State v. Emery*, 174 Wn.2d 741, 762, 278 P.3d 653 (2012). The theory of preservation by timely objection also addresses several other concerns. The rule serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials, facilitates appellate review by ensuring that a complete record of the issues will be available, and prevents adversarial unfairness by ensuring that the prevailing party is not deprived of victory by claimed errors that he had no opportunity to address. *State v. Strine*, 176 Wn.2d at 749-50; *State v. Scott*, 110 Wn.2d 682, 688, 757

16

P.2d 492 (1998).

Countervailing policies support allowing an argument to be raised for the first time on appeal. For this reason, RAP 2.5(a) contains a number of exceptions. RAP 2.5(a) allows an appellant to raise for the first time a "manifest error affecting a constitutional right," an exception on which a criminal appellant commonly relies. Constitutional errors are treated specially under RAP 2.5(a) because they often result in serious injustice to the accused and may adversely affect public perceptions of the fairness and integrity of judicial proceedings. *State v. Scott*, 110 Wn.2d at 686-87. Prohibiting all constitutional errors from being raised for the first time on appeal would result in unjust imprisonment. *State v. Lynn*, 67 Wn. App. 339, 344, 835 P.2d 251 (1992). On the other hand, "permitting *every possible* constitutional error to be raised for the first time on appeal undermines the trial process, generates unnecessary appeals, creates undesirable retrials and is wasteful of the limited resources of prosecutors, public defenders and courts" *State v. Lynn*, 67 Wn. App. at 344 (1992).

Frank Lazcano's double jeopardy assertion implicates a constitutional right. We must decide if the argument addresses "manifest error."

Washington courts and even decisions internally have announced differing formulations for "manifest error." First, a manifest error is one "truly of constitutional magnitude." *State v. Scott*, 110 Wn.2d at 688. Second, perhaps perverting the term "manifest," some decisions emphasize prejudice, not obviousness. The defendant must

17

identify a constitutional error and show how, in the context of the trial, the alleged error actually affected the defendant's rights. It is this showing of actual prejudice that makes the error "manifest," allowing appellate review. *State v. O'Hara*, 167 Wn.2d at 99 (2010); *Scott*, 110 Wn.2d at 688; *Lynn*, 67 Wn. App. at 346. A third and important formulation for purposes of this appeal is the facts necessary to adjudicate the claimed error must be in the record on appeal. *State v. McFarland*, 127 Wn.2d at 333 (1995); *State v. Riley*, 121 Wn.2d 22, 31, 846 P.2d 1365 (1993).

In *State v. Riley*, Joseph Riley argued that the admission of incriminating statements violated his Fourth Amendment rights because the statements were the fruit of an illegal search of his home. The state high court refused to entertain the argument because the record lacked clarity as to whether Riley uttered the statements before being told the investigating officer possessed a search warrant.

We consider whether the record on appeal is sufficient to review Frank Lazcano's double jeopardy contention. In particular, we ponder whether the record permits intelligent review of the *Diaz* exception to the double jeopardy clause.

Both the United States and the Washington Constitution protect one from being placed twice in double jeopardy for the same offense. The federal and state provisions afford the same protections and are identical in thought, substance, and purpose. *State v. Ervin*, 158 Wn.2d 746, 752, 147 P.3d 567 (2006); *In re Pers. Restraint of Davis*, 142 Wn.2d 165, 171, 12 P.3d 603 (2000).

Frank Lazcano argues that the State may not avoid double jeopardy by claiming a narrow exception articulated by the U.S. Supreme Court. Even if the double jeopardy clause would otherwise apply, it does not bar prosecution for a greater charge if, when jeopardy attached to a lesser charge, a fact essential to support the greater charge was not in existence or was not discoverable by the State in the exercise of due diligence. *Diaz v. United States*, 223 U.S. 442, 448-49, 32 S. Ct. 250, 251, 56 L. Ed. 500 (1912); *Illinois v. Vitale*, 447 U.S. 410, 420 n.8, 100 S. Ct. 2260, 65 L. Ed. 2d 228 (1980); *Brown v. Ohio*, 432 U.S. 161, 169 n.7, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977). Washington courts call the exception the *Diaz* exception. *State v. Higley*, 78 Wn. App. 172, 180-81, 902 P.2d 659 (1995).

In *State v. Higley*, this court refused to bar, under the double jeopardy clause, prosecution for vehicular assault when the defendant had previously been charged with driving while under the influence and reckless driving for the same car collision. John Higley, while driving drunk, was involved in a two-car accident. Medical staff informed the investigating officer that the driver of the other car was not seriously injured. After completion of the first prosecution, the State learned that the other driver suffered a brain injury and broken neck that warranted a felony charge. This court reasoned that the investigating officer held no duty to contact the victim again to update information on her injuries. Therefore, the *Diaz* exception applied.

In our case, the murder occurred before the first charges brought against Frank

19

Lazcano. Thus all facts existed to charge Lazcano with homicide at the time the State charged him with trespass. To resolve the *Diaz* exception, we would need to determine if law enforcement could have earlier discovered the body or other evidence of murder with the exercise of due diligence. In other words, under the exception, a court would need to decide if a thorough investigation would have disclosed the crucial evidence.

The trial court, when analyzing Frank Lazcano's collateral estoppel contention, commented that law enforcement officers did not earlier have grounds to charge murder because of the lack of a dead body, the absence of blood and casings in the Malden alley, and the belief that Marcus Schur may be hiding. Daniel and Frank Lazcano misled law enforcement officers into believing they had no knowledge of the whereabouts of Schur, when the two knew Schur was surely dead. They hid the corpse. One could conclude from these facts that the *Diaz* exception should apply.

One could also conclude that the *Diaz* exception should not apply because law enforcement might have discovered the body with additional efforts. The record only vaguely shows the extent of the efforts law enforcement officer underwent to attempt to locate Schur during a three-month window of time. The record shows that officers spoke to some relatives and friends of Schur, but the record fails to detail or rule out any other measures exercised by law enforcement. Law enforcement relied on the word of the Lazcano brothers, who Deputy Cox admitted he did not find credible, and on rumors that Marcus Schur used methamphetamine and might have disappeared on a binge.

20

In short, the record deserves further development. Also, the determination of what constitutes due diligence or a thorough investigation, in this context, is generally left to the discretion of the trial court and so should first be addressed by the lower court. *Prlia v. United States*, 279 F.2d 407, 408 (9th Cir. 1960); *United States v. Walker*, 546 F. Supp. 805, 811 (D.C. Haw. 1982).

We recognize that Washington appellate courts have allowed an accused to assert a double jeopardy claim for the first time on appeal because the argument asserted a constitutional error. *State v. Strine*, 176 Wn.2d at 751 (2013); *State v. Mutch*, 171 Wn.2d 646, 661, 254 P.3d 803 (2011); *State v. Jackman*, 156 Wn.2d 736, 746, 132 P.3d 136 (2006); *State v. Tvedt*, 153 Wn.2d 705, 709, n.1, 107 P.3d 728 (2005); *State v. Johnson*, 92 Wn.2d 671, 673-74, 600 P.2d 1249 (1979). Some of the decisions did not address whether the constitutional error was "manifest." *State v. Mutch*, 171 Wn.2d 646; *State v. Jackman*, 156 Wn.2d 736; State *v. Tvedt*, 153 Wn.2d 705; *State v. Johnson*, 92 Wn.2d 671. In *State v. Strine*, 176 Wn.2d at 751, the Supreme Court accepted review of a double jeopardy argument only after declaring the argument implicated the defendant's "manifest constitutional right to be free from double jeopardy." The Supreme Court did not analyze why it concluded the defendant asserted a "manifest error" and did not expressly rule that all double jeopardy claims present manifest error.

We refuse to imply from such decisions that an appellant need not show manifest error in double jeopardy appeals. Double jeopardy arguments are no different from other

21

constitutional arguments for purposes of the need to preserve error below and for purposes of allowing an exception for manifest error. No Washington decision has held that the accused need not show manifest constitutional error on double jeopardy claims not asserted below. The general rule remains that a criminal defendant may not obtain a new trial whenever he or she can identify a constitutional error not litigated below. *State v. Scott*, 110 Wn.2d at 687 (1988). The manifest error exception is a narrow one. *State v. Scott*, 110 Wn.2d at 687. We particularly decline to consider a double jeopardy argument to automatically be manifest error in the circumstances when the record lacks specificity for review.

Our refusal to address Frank Lazcano's double jeopardy claim may work to his favor. If he files a personal restraint petition, he will have the right to present new evidence of any alleged failure of law enforcement to diligently pursue the whereabouts and safety of Marcus Schur. *State v. Sandoval*, 171 Wn.2d 163, 168-69, 249 P.3d 1015 (2011); *State v. McFarland*, 127 Wn.2d at 335 (1995). A trial court sits in a better position to conduct a full evidentiary hearing on the due diligence of law enforcement.

*ISSUE 3: Despite the absence of manifest error, should we review the double jeopardy argument anyway?*

*ANSWER 3: No.*

If an issue raised for the first time on appeal is "arguably related" to issues raised in the trial court, a court may exercise its discretion to consider newly articulated theories

22

for the first time on appeal. *Lunsford v. Saberhagen Holdings, Inc.*, 139 Wn. App. 334, 338, 160 P.3d 1089 (2007), *aff'd*, 166 Wn.2d 264 (2009). While the reviewing court has the discretion to address the issue, we are not bound to do so and usually refuse. *Smith v. Shannon*, 100 Wn.2d at 38 (1983); *City of Spokane v. Whitehead*, 128 Wn. App. 145, 149, 115 P.3d 336 (2005); *State v. Houvener*, 145 Wn. App. 408, 420, 186 P.3d 370 (2008).

One category of double jeopardy is collateral estoppel. The doctrine of collateral estoppel is embodied in the constitutional guarantee against double jeopardy. *Ashe v. Swenson*, 397 U.S. 436, 442-43, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970). We decline to address whether the two doctrines are sufficiently related to otherwise review Frank Lazcano's double jeopardy claim on appeal. Assuming such a relationship, we exercise our discretion in declining review because of an insufficient record of the due diligence of law enforcement officers.

*Issue 4: Whether sufficient evidence supports Frank Lazcano's conviction for first degree felony murder while armed with a firearm?*

*Answer 4: Yes.*

Frank Lazcano contends that this court should reverse his conviction for first degree felony murder with a firearm enhancement because the evidence against him is insufficient. Lazcano's conviction for felony murder rests on either participating in a burglary or being an accomplice to the shooting of Marcus Schur. He maintains that the

evidence presented by the State at trial is insufficient to prove either ground of liability, as required by *State v. Carter*, 154 Wn.2d 71, 77, 109 P.3d 823 (2005).

When a defendant challenges the sufficiency of the evidence underlying his conviction, he admits the truth of the State's evidence and all inferences that reasonably may be drawn from the evidence. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). This court views the evidence in the light most favorable to the State and asks whether any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 220-21, 616 P.2d 628 (1980). The reviewing court considers circumstantial evidence equally reliable as direct evidence. *State v. Myers*, 133 Wn.2d 26, 38, 941 P.2d 1102 (1997); *State v. Delmarter*, 94 Wn.2d 634, 638, 618 P.2d 99 (1980). Credibility determinations are for the trier of fact and cannot be reviewed on appeal. *State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

Under an accomplice liability theory, the State must prove the substantive crime was committed and the accused acted with knowledge that he or she was aiding in the commission of the offense. *State v. Peterson*, 54 Wn. App. 75, 78-79, 772 P.2d 513 (1989). Under RCW 9A.08.020(3)(a), a person is guilty as an accomplice of another person in the commission of the crime if, with knowledge that it will promote or facilitate the crime he or she:

(i) Solicits, commands, encourages, or requests such other person to

commit [the crime]; or
(ii) Aids or agrees to aid such other person in planning or committing [the crime].

Washington's first degree murder statute RCW 9A.32.030 provides, in relevant part:

(1) A person is guilty of murder in the first degree when . . .
(c) He or she commits or attempts to commit the crime of . . . (3) burglary in the first degree . . . and in the course of or in furtherance of such crime or in immediate flight therefrom, he or she, or another participant, causes the death of a person other than one of the participants: Except that in any prosecution under this subdivision (1)(c) in which the defendant was not the only participant in the underlying crime, if established by the defendant by a preponderance of the evidence, it is a defense that the defendant:
(i) Did not commit the homicidal act or in any way solicit, request, command, importune, cause, or aid the commission thereof; and
(ii) Was not armed with a deadly weapon, or any instrument, article, or substance readily capable of causing death or serious physical injury; and
(iii) Had no reasonable grounds to believe that any other participant was armed with such a weapon, instrument, article, or substance; and
(iv) Had no reasonable grounds to believe that any other participant intended to engage in conduct likely to result in death or serious physical injury.

RCW 9A.08.020(3)(a), the general accomplice statute, and RCW 9A.32.030, the felony murder statute, supply alternative grounds under which an accused may be found guilty of murder whenever the accused is not the shooter. The felony murder provision of the first degree murder statute establishes a separate mechanism by which one who commits a predicate felony may be criminally liable for a homicide committed in the course of that felony by a coparticipant in the commission of the underlying felony. *State*

*v. Carter*, 154 Wn.2d at 78 (2005). The participant liability clause of the felony murder provision of the first degree murder statute is essentially a built-in vicarious liability provision that provides a mechanism by which liability for a homicide may be imputed to a coparticipant who does not commit a homicide. *State v. Carter*, 154 Wn.2d at 79. Thus, though one participant in a predicate felony, alone, commits a homicide during the commission of, or flight from, such felony, the other participant in the predicate felony has, by definition, committed felony murder. *State v. Carter*, 154 Wn.2d at 79. In such cases, the State need not prove that the nonkiller participant was an accomplice to the homicide. *State v. Bolar*, 118 Wn. App. 490, 504-05, 78 P.3d 1012 (2003).

In its closing argument, the State argued that Frank Lazcano had credible grounds to believe his brother, Daniel, had an AK-47 in the car when they went to Nick Backman's house; that Frank's actions in Backman's house constituted first degree burglary; and that Daniel acted as an accomplice to the burglary. The State explained to the jury that it could find Frank guilty of felony murder, "[e]ven if it was an accident" because Daniel, a participant in the underlying felony, had caused the death of Marcus Schur in the course of the burglary. RP at 911-12.

Drawing all reasonable inferences in favor of the State, the evidence here was sufficient for a jury to reasonably infer that Daniel Lazcano was an accomplice to Frank Lazcano's burglary of Nick Backman's house or guilty by reason of participating in another felony. At trial, Ben Evensen's mother testified that she had conversations with

26

Frank and Daniel about confronting Marcus Schur and David Cramer, before Schur was killed. In addition, the jury heard testimony that Frank and Daniel traveled to Backman's house together; that Daniel drove his car to the scene and later circled around to the back of Backman's house; and that he was very upset and wanted to confront Schur. This circumstantial evidence is enough to allow the jury to infer that Daniel was an accomplice to the burglary that Frank committed on December 27, 2011.

Frank Lazcano argues that the State must, and has failed to, prove an additional "layer" of accomplice liability in order to obtain a conviction for felony murder; that is, Frank was an accomplice to the shooting committed by Daniel Lazcano. RCW 9A.32.030, Washington's felony murder statute, reads to the contrary. In *Carter*, our Supreme Court upheld a felony murder conviction of a woman who helped plan, but did not ultimately participate in, a burglary that resulted in the shooting death of a man. *Carter*, 154 Wn.2d at 83-84. Substantial evidence supports Frank Lazcano's conviction for felony murder.

*Issue 5: Whether the trial court improperly admitted Daniel Lazcano's out of court statements in violation of the Confrontation Clause?*

*Answer 5: Yes.*

Frank Lazcano argues that the trial court improperly admitted statements made by Daniel Lazcano to Deputy Tim Cox during Cox's questioning of Daniel. He maintains Daniel's statements were testimonial; that Daniel was unavailable to testify at trial due to

27

his invocation of the Fifth Amendment; and that Frank was unable to cross-examine Daniel prior to the admission of his statements at trial. Frank raised this objection during trial when the prosecution questioned Deputy Cox about his conversation with Daniel immediately following Frank's arrest. The trial court overruled the objection, reasoning that Daniel's statements were admissible hearsay for the limited purpose of showing Frank and Daniel Lazcano's knowledge and intent prior to entering Nick Backman's house.

The Sixth Amendment to the United States Constitution guarantees a defendant the right to confront witnesses against him or her. U.S. CONST. amend. VI. Washington's Constitution also grants an accused, in a criminal prosecution, the right "to meet the witnesses against him face to face." CONST. art. 1, § 22. Washington protections are coextensive with their federal counterpart. *State v. Lui*, 179 Wn.2d 457, 468-69, 315 P.3d 493, *cert. denied*, 134 S. Ct. 2842 (2014). This court reviews de novo an alleged violation of the confrontation clause, *State v. Jasper*, 174 Wn.2d 96, 108, 271 P.3d 876 (2012), and whether or not a statement was hearsay. *State v. Neal*, 144 Wn.2d 600, 607, 30 P.3d 1255 (2001).

In general, the confrontation clause prohibits the admission of an unavailable declarant's out-of-court statement that might otherwise meet one of the exceptions to the general prohibition against hearsay, if the hearsay qualifies as testimonial. *Davis v. Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006); ER 801(c).

28

A witness' out-of-court statement is testimonial if, in the absence of an ongoing emergency, the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution. *Davis*, 547 U.S. at 822. The admission of testimonial hearsay statements of a witness who does not appear at a criminal trial violates the confrontation clause of the Sixth Amendment unless (1) the witness is unavailable to testify and (2) the defendant had a prior opportunity for cross-examination. *Crawford v. Washington*, 541 U.S. 36, 53-54, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004); *State v. Beadle*, 173 Wn.2d 97, 107, 265 P.3d 863 (2011). Statements made during an interrogation by law enforcement are considered testimonial. *Crawford*, 541 U.S. at 53-54.

During trial, Deputy Tim Cox testified to an interview of Daniel Lazcano during the criminal investigation. Cox declared that Daniel stated his brother Frank went to Nick Backman's home to retrieve his belongings.

The admission of Daniel Lazcano's statements violated Frank Lazcano's rights under the confrontation clause. Daniel's statements qualify as hearsay because they were made out of court, and offered to prove the truth of the matter asserted - Frank's intent in visiting Nick Backman's house. *See* ER 801(c). Under *Davis*, the statements are testimonial because they were made to law enforcement during an interrogation, for the purpose of proving past events relevant to the State's prosecution of Frank. 547 U.S. at 822. During Frank's trial, the State called Daniel as a witness, and Daniel immediately

invoked his right to remain silent, leading the court to rule him an unavailable witness. There is no evidence in the record showing that Frank had a prior opportunity to cross-examine Daniel before Frank's trial. Therefore, the trial court's admission of Daniel's testimonial hearsay violated Frank's right to confront witnesses against him under the Sixth Amendment.

*Issue 6: Whether the improper admission of Daniel Lazcano's extrajudicial statement was harmless error?*

*Answer 6: Yes.*

The trial court's admission of otherwise inadmissible evidence does not warrant reversal per se. This court must also decide if the error in admitting the testimony was harmless or prejudicial. A constitutional error is harmless if the appellate court is assured beyond a reasonable doubt that the jury verdict is unattributable to the error. *State v. Anderson*, 171 Wn.2d 764, 770, 254 P.3d 815 (2011). This court employs the overwhelming untainted evidence test and looks to the untainted evidence to determine if it is so overwhelming that it necessarily leads to a finding of guilt. *Anderson*, 171 Wn.2d at 770.

Here, an abundance of untainted evidence could have led the jury to find Frank Lazcano guilty of felony murder. Frank himself testified and admitted the same information Daniel provided to Deputy Cox—that he was at Nick Backman's house, and that he went there for the purpose of retrieving the goods stolen from him and Daniel.

His admission alone renders Cox's testimony harmless. In addition, Frank Lazcano conceded during his trial testimony that he witnessed his brother shoot Marcus Schur and that he participated in covering up Schur's death.

*Issue 7: Whether the State improperly elicited testimony from its witnesses that they had entered into formal agreements to tell the truth in exchange for reduced charges?*

*Answer 7: Yes.*

Frank Lazcano argues that the State improperly vouched for its own witnesses during trial by repeatedly referencing promises they made with the State to provide truthful testimony in exchange for a reduced charge. Lazcano relies on *State v. Ish*, 170 Wn.2d 189, 199, 241 P.3d 389 (2010), in arguing that the statements elicited by the State from its witnesses regarding their promises to tell the truth, constitute prosecutorial misconduct. In *Ish*, our Supreme Court addressed a similar situation, wherein a prosecutor called Nathaniel Ish's cellmate to testify against him, and referenced on direct examination a plea agreement reached with the cellmate in which he received a reduced sentence in exchange for testifying truthfully. The Supreme Court held that the trial court abused its discretion in denying the defendant's pretrial motion to exclude all reference to the plea agreement from the State's case in chief.

*State v. Ish* controls. As Frank Lazcano argues, the State made plea agreements with several of its witnesses against him and improperly vouched for their truthfulness

31

during trial by referencing those agreements' requirement that the witness tell the truth. Accordingly, under *Ish*, the State's actions here amounted to misconduct.

*Issue 8: Whether reference to State witnesses' promise to tell the truth was harmless error?*

*Answer 8: Yes.*

The Supreme Court, in *State v. Ish*, 170 Wn.2d at 200 (2010), ultimately concluded that the error was harmless. The high court noted that there were several other witnesses at trial who testified to the same information provided by the cellmate and that the State "did not dwell on the issue." *Ish*, 170 Wn.2d at 201.

Frank Lazcano did not object to the State's misconduct at trial. Failure to object to an improper comment constitutes waiver of error unless the comment is so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction to the jury. *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997).

The State's repeated vouching for its own witnesses, while qualifying as prosecutorial misconduct, could have likely been neutralized by a curative instruction to the jury. As explained above, the State presented multiple witnesses that provided fairly consistent accounts of the events surrounding Marcus Schur's death, and Frank Lazcano himself corroborated much of their testimony. Under these circumstances, Frank's failure to object to the prosecutor's misconduct at trial amounts to a waiver of the issue

32

on appeal. And even if this court found that Frank did not waive the issue, the other witnesses testifying to the same or similar evidence as the witnesses who made plea deals makes the misconduct harmless in Frank's case.

*Issue 9: Whether cumulative error requires a new trial?*

*Answer 9: No.*

Under the cumulative error doctrine, a defendant may be entitled to a new trial when the trial court's multiple errors combine to deny the defendant a fair trial. *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 332, 868 P.2d 835 (1994). The defendant bears the burden of proving an accumulation of error of sufficient magnitude to warrant a new trial. *Lord*, 123 Wn.2d at 332; *see, e.g., State v. Perrett*, 86 Wn. App. 312, 322-23, 936 P.2d 426 (1997). A defendant is entitled to a fair trial but not a perfect one, for there are no perfect trials. *Brown v. United States*, 411 U.S. 223, 231-32, 93 S. Ct. 1565, 36 L. Ed. 2d 208 (1973). As explained above, the errors alleged by Frank Lazcano, while errors, did not deny him of a fair trial. Overwhelming evidence supports his conviction. Cumulative error does not apply here, as Frank Lazcano has not shown sufficient prejudice warranting reversal, based on the combined effect of these two errors.

## CONCLUSION

We affirm Frank Lazcano's conviction for first degree murder.

No. 31601-7-III
*State v. Lazcano*

_____  
Fearing, J.

WE CONCUR:

_____  
Korsmo, J.

_____  
Lawrence-Berrey, J.