**FILED**
**FEBRUARY 6, 2025**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Dependency of | ) | |
| | ) | No. 40150-2-III |
| M.N.W. | ) | (Consolidated with |
| | ) | No. 40151-1-III) |
| K.K.W. | ) | |
| | ) | UNPUBLISHED OPINION |

STAAB, A.C.J. — A.C. appeals the trial court's conclusion that his children,
M.N.W. and K.K.W., are dependent. He contends the family was denied their statutory
right to have an independently informed guardian ad litem (GAL) make a dependency
recommendation when the substitute GAL only became involved with the case on the
fourth day of trial. Additionally, A.C. contends the court erred when it entered a
condition of placement that required the parents to provide advance notice of any changes
of residence or if they separated.

We decline to review these issues because they were not preserved at the trial
court level. RAP 2.5(a). Timely objections would have provided the trial court an
opportunity to cure any issues and make any necessary adjustments or accommodations.
Additionally, we note that the placement condition challenge is now moot because the
children were removed from the parents' care, custody, and control.

BACKGROUND

The majority of this background section is taken from the unchallenged findings in the order of dependency.

The father, A.C., and the mother, P.A.C., are parents to four-year-old M.N.W., and one-year-old, K.K.W.[1] Both children have resided with the parents for their entire lives, except for a brief period in 2021 through 2022, when they were voluntarily placed out of the home.

Both parents have struggled with substance abuse and domestic violence. The parents have a history of chronic drug problems, using methamphetamine 3-4 times a week. Additionally, the parents have experienced homelessness and have moved numerous times. At times, the parents have resided in their vehicle, at shelters, with various relatives of each parent, and have moved between Texas, South Carolina, as well as Western and Eastern Washington.

On October 24, 2019, A.C. called "CPS" (Child Protective Services) and spoke with an intake worker, informing her that he was experiencing homelessness in the Renton, Washington area and that his girlfriend, P.A.C., had left him and returned to Yakima, Washington. He explained that P.A.C. was using methamphetamine regularly and recently used it in front of her other child. He reported ongoing domestic violence

---

[1] P.A.C. has an older child, G.Z., with a different father, who is not part of this appeal.

between himself and P.A.C. and that she had threatened to kill A.C. and herself several weeks prior.

That same day, a social worker with DCYF (Department of Children, Youth, and Families) met with P.A.C. at her grandmother's home in Yakima. She admitted that she used methamphetamine two days earlier, she was unhoused, and that she had previously been living with her boyfriend, A.C. She informed the social worker that she left A.C. because of his drug use and she planned to reside with her family in Yakima to get help for her methamphetamine use.

The family then moved to South Carolina. Between July and September 2022, both parents had an open voluntary services case with South Carolina's Department of Social Services. During this time, both parents admitted to using methamphetamine and P.A.C.'s oldest child, G.Z., along with M.N.W., tested positive for methamphetamine by hair follicle testing. In September, the parents informed South Carolina's Department of Social Services that they would be returning to Washington State and were not going to engage in the services. Once in Washington, a social worker with the DCYF received an intake regarding the family and met with both parents. During this intake, both parents expressed that they were still using substances.

In May 2023, the parents were involved in a domestic violence incident at a park in Yakima where a bystander witnessed the parents become physical with each other. When officers arrived, M.N.W. was found sucking on what appeared to be a glass

methamphetamine pipe. As a result of this incident, P.A.C. was arrested for fourth degree assault–domestic violence and taken to jail.

On June 7, after the incident at the park the preceding month, DCYF filed a dependency petition. The following day the court held a shelter care hearing where both parents and the court-appointed GAL, Schoolcraft, were present. At the shelter care hearing, the court released the children to P.A.C.

In late August, the court commenced a fact-finding hearing on the dependency petition. DCYF asserted that the parents were continuing to use illegal substances, noting that A.C. had used methamphetamine as recently as several days before the hearing.[2]

On the second day of the hearing, the court determined that it would need additional time to hear from all of the witnesses. GAL Schoolcraft[3] informed the court that he was only available until September 17, and that he would be unavailable September 18 through part of October. Despite the GAL's scheduling conflict, the court scheduled the hearing to reconvene in late September. For this reason, GAL Schoolcraft was able to attend the first three days of the hearing but was unavailable for the remainder, requiring another GAL to substitute in.

---

[2] The witnesses provided testimony consistent with the facts set forth above.

[3] Although the transcript spells the GAL's name as "Schoolkraft," we use the spelling of "Schoolcraft" from the Guardian ad Litem Volunteer Background Information sheet. Clerk's Papers at 788.

On September 25, 2023, GAL Theall substituted in for Schoolcraft and was

present for the remainder of the hearing as well as the closing arguments, which occurred

on September 29.  GAL Theall acknowledged that she came "late to the party" and that

there had been "a lot of testimony."  Rep. of Proc. (RP) at 440.  Before providing her

recommendation to the court, she expressed the following concerns:

> I've looked through a lot of notes on this case and have taken a prolific
> amount of notes today.  We're talking about kids that have been exposed to
> the kinds of things that these kids have been exposed to, one event of
> homelessness or one event of exposure to domestic violence or drug use or
> mental health issues isn't enough to rise to the place where we start a
> dependency.  But when we're looking at, no matter where the parents have
> gone, they've had law enforcement contact.  When we're looking at the fact
> that it happened in South Carolina.  There was a reference to I think Texas,
> then the west side.  Wherever they're going, their behavior is not in control
> enough to keep them out of law enforcement contact, which means we're
> just seeing the tip of the iceberg when we see what the kids are being
> exposed to.
>
> It's very concerning that there is reports of meth pipes and positive
> UAs[4] by the kids.  That's extremely dangerous.  This isn't something that
> is going to help the kids' development—develop normally, to develop in a
> way that their brain is building and they're getting the things that they need.
> And so, when I look at that risk and I look at the 17 safety risks, I
> absolutely am concerned for their safety.
>
> I wanted to hear all the testimony before I made a best interest
> statement, and I believe at this point that it would be in their best interest
> for them to be in a dependency so that the family can get the investment
> and what they need and get to a better place.  We already have siblings that
> have been broke apart at this point, and that is a really tough thing for kids.
> They need—at—at their developmental age, they need real concrete things.
> They need regular schedules.  It's not enough to just have mom or dad or

---

[4] Urinalysis.

> somebody standing in—in their place taking care of them. These are children, and they really need to have that bond and that safety and not be exposed to the kinds of things that are in the petition.

RP at 440-41.

On cross-examination, GAL Theall acknowledged that she was filling in for GAL Schoolcraft and had not been present for all stages of the proceedings. In particular, when asked whether she did "any independent investigation such as contacting any of the witnesses?" she responded, "No. As I was here today to listen to witnesses." RP at 443. She clarified that she heard testimony from three witnesses in person—from a DCYF caseworker, P.A.C., and a representative from Camp Hope where the parents were residing. She also reviewed notes from GAL Schoolcraft regarding the testimony of prior witnesses. Neither party objected to GAL Theall's testimony.

After considering all of the testimony, the court found M.N.W. and K.K.W. met the definition of a dependent child under RCW 13.34.030(6)(c).

At the disposition hearing, the court placed the children with their parents subject to certain conditions. As part of their placement conditions, the parents were required to provide advanced notice to DCYF and the GAL of any changes to their residence or if they separated.

A.C. appeals.

ANALYSIS

1.  SUBSTITUTE GAL

A.C. contends that the trial court abused its discretion when it permitted the substitute GAL to make a recommendation despite her admission that she failed to conduct an independent investigation. We conclude that this issue was not preserved at the trial court level and decline to review the issue on appeal.

*A.  Error Preservation*

Under RAP 2.5(a), this court may refuse to review a claim of error that was not raised in the trial court. Requiring error preservation through objections "serves the goal of judicial economy by enabling trial courts to correct mistakes and thereby obviate the needless expense of appellate review and further trials." *State v. Lazcano*, 188 Wn. App. 338, 356, 354 P.3d 233 (2015).

Here, A.C. did not object below to the GAL's investigation, testimony, recommendation, or the trial court's consideration of her report. As such, the argument is not preserved for our review. As the State notes, a proper objection would have allowed the trial court to cure any potential errors in several ways. For example, the court could have evaluated the adequacy of the GAL's investigation on the record, allowing the court to determine it was sufficient or allowing the court to stay the trial to require a more thorough investigation. Alternatively, the court could have appointed counsel for M.N.W. pursuant to RCW 13.34.212(2)(a) and deemed the GAL requirement satisfied or

determined there was good cause to proceed without a GAL. RCW 13.34.100(1).

Regardless, an objection would have enabled the trial court to correct any potential

mistakes. Consequently, this issue is unpreserved and we decline to review it.

2.   PLACEMENT CONDITIONS

Next, A.C. argues the trial court abused its discretion by imposing a condition on

placement that required the parents to provide advance notice to DCYF and the GAL of

any changes in their residence or if they separated. Again, this argument is unpreserved

under RAP 2.5(a). Additionally, it is moot.

As set forth above, under RAP 2.5(a), this court may refuse to review a claim of

error that was not raised in the trial court. Here, A.C. did not object to the trial court

imposing a condition on placement that required the parents to provide advance notice to

DCYF and the GAL of any changes in their residence or if they separated. On appeal,

A.C. argues that the conditions fail to account for emergent situations such as a domestic

violence incident, where one of the parents may need to unexpectedly change residences.

A timely objection would have allowed the trial court to clarify or explain its condition

should such an unexpected event occur.

Even if an objection had preserved the issue, it is now moot. A case is

[considered] moot if a court can no longer provide effective relief. *In re Det. of H.N.*,

188 Wn. App. 744, 749, 355 P.3d 294 (2015). Generally, an appellate court will not

review a moot case. *Id*.

Here, the court can no longer provide effective relief for A.C. As the State notes, the record on appeal includes a subsequent order removing the children from the parents and placing them in the custody, care, and control of DCYF. Thus, the placement condition A.C. takes issue with is no longer in effect.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
                                        Staab, A.C.J.

WE CONCUR:

_____
Fearing, J.

_____
Melnick, J.P.T.†

---

† Rich Melnick, a retired judge of the Washington State Court of Appeals, is serving as a judge pro tempore of this court pursuant to RCW 2.06.150(1)