# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

STATE OF WASHINGTON,

               Respondent,

    v.

BRANDON KENNETH GORHAM,

               Appellant.

DIVISION ONE

No. 79071-4-I

UNPUBLISHED OPINION

FILED: June 24, 2019

DWYER, J. — Brandon Gorham was convicted by jury verdict of assault in the first degree and hit and run driving. He was sentenced to a standard range term of incarceration. On appeal, Gorham contends that the State presented insufficient evidence to support his conviction for assault in the first degree, that the trial court erred by admitting a custodial statement he made notwithstanding violation of his Miranda[1] rights, that the prosecutor engaged in misconduct during closing argument by telling the jury his personal opinion of the credibility of a witness, that the trial court erred by declining to instruct the jury on a lesser-included offense of vehicular assault, and that the trial court improperly imposed on Gorham a $250 discretionary jury demand fee. We remand for the trial court to strike the discretionary fee, but, finding no merit to any of Gorham's other contentions, affirm the conviction.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

I

On September 10, 2016, Zachary Lucore, a self-admitted drug addict,[2] attempted to visit his parents' home. However, because of his drug addiction, his family turned him away at the door. Subsequently, Lucore walked to a friend's home on Fredericksburg Way in Vancouver, Washington. Upon arriving, he discovered that his friend did not appear to be at home. Nevertheless, he attempted to connect his cell phone to her Wi-Fi network.

Meanwhile, Gorham was seated on the front porch of the house across the street, listening to music and drinking beer with his friend Richard Rigney and another person.[3] Gorham lived in the house, which he shared with his mother, Helene Guinette, and Rigney.

As he was connecting to the Wi-Fi network, Lucore was accosted by someone from Gorham's house. Either Guinette or a friend of hers (who was also inside the house) shouted out to Lucore across the street. Lucore heard a woman's voice telling him to leave the area in what he considered to be a very rude manner. Irritated, Lucore responded vulgarly, which led to a verbal confrontation between Lucore and Gorham.

---

[2] It is unclear from the record whether or not Lucore had used drugs, specifically methamphetamine, on the day in question. Lucore denies having used any drugs that day. A urine screening taken that day tested positive for methamphetamines, but the examining physician who performed the screening explained that methamphetamine can stay in a person's system for up to 72 hours and, therefore, he could not be certain if Lucore had used methamphetamine that day.

[3] According to one account given by Gorham, he spent the entire day drinking beer and was quite intoxicated by the time Lucore arrived at Fredericksburg Way. However, this claim was contradicted both by other witnesses, who testified that Gorham had worked on the day in question, rather than spending the whole day drinking, and by Gorham himself when he later claimed that he had a very high tolerance for alcohol and was, therefore, not actually able to say whether he was intoxicated.

At trial, Lucore and Gorham agreed that, employing indecorous language, they both shouted insults and threats at one another. However, they recalled the specifics of the confrontation differently.

As Lucore described the argument, Gorham explicitly threatened to run him over with his truck, leading Lucore to threaten to cut Gorham with a knife Lucore was holding. Although Lucore admitted to holding and verbally threatening Gorham with the knife, he claimed that he never actually brandished it toward Gorham.

As Gorham described the argument, he never threatened to run Lucore over with his truck. Instead, Gorham claimed, Lucore both verbally threatened him with a knife and actually brandished it, threatening to use it both on Gorham and Guinette.

Following the verbal altercation, Lucore left the area by walking north on Fredericksburg Way before turning left onto Tennessee Lane. Tennessee Lane is home to the Martinez-Rodríguez family, two members of which, Armando and Manuel, were outside as Lucore came walking down their street. Lucore said hello to both Armando and Manuel as he passed. As Lucore proceeded down Tennessee Lane, he placed bluetooth headphones into his ears in order to listen to music. He then turned north onto Garrison Road.

As Lucore left the area, Gorham rushed into his home to grab the keys to his truck, a Ford F-250. As he exited the house and jumped into his truck, he was chased by Guinette, who, presumably alarmed by his behavior, was pleading with him to stop. Ignoring his mother, Gorham drove off and turned

onto Tennessee Lane, going in the same direction as Lucore had traveled. As he drove past Armando and Manuel, they noticed that he was driving at a much higher speed than was normal for that street. As Gorham approached the intersection of Tennessee and Garrison, he did not slow down or stop at the intersection's stop sign. Rather, he accelerated as he turned north onto Garrison.

At this point, Gorham's account of events differs from those of Lucore's and other witnesses. However, all agree that Lucore was walking north on the east side of Garrison Road when he was struck by Gorham's vehicle and run over.[4] According to Manuel, who witnessed the collision, Lucore was walking approximately three feet from the curb when Gorham accelerated and drove his truck directly toward Lucore, hitting him, running him over, swerving away from the curb, and then nearly striking another vehicle while driving away from the scene.[5] According to Gorham, Lucore was not three feet from the curb but, rather, walked out into the middle of the road from behind a parked landscaping truck,[6] leaving Gorham with insufficient time to stop before hitting him. However, Gorham admitted that he panicked after hitting Lucore and drove away rather than stopping to assist him after the collision.

---

[4] At the time of the incident there was no sidewalk on the east side of Garrison Road.

[5] Lucore did not recall being struck by the truck. His recollection was solely of walking north along the east side of Garrison and then waking up on the ground about 10 to 15 feet away from where he had previously been with his belongings scattered about.

[6] None of the other witnesses to the collision or to its aftermath corroborated Gorham's claim that there was a landscaping truck parked on Garrison Road. Similarly, no such truck appears in any of the photographs taken of the scene by police investigators following the incident.

After running over Lucore, Gorham returned home, parked his truck in his driveway, and went back inside his house. He did not tell Guinette about what had occurred but did inform Rigney that he had chased down Lucore.

Meanwhile, the Martinez-Rodríguezes called 911. Medical personnel arrived and transported Lucore to the hospital. As a result of the incident, Lucore suffered from six rib fractures, a punctured lung, vertebral fractures, multiple pelvic fractures, a penis tear, an anal tear, a ruptured bladder, and a fracture of the orbital floor, all of which necessitated multiple surgical interventions over the course of several months in the hospital and an additional several months following release.

By the time Officer Dale Barnette arrived at the scene, Lucore had been moved into an ambulance. Barnette spoke with medical personnel to identify Lucore and then spoke with witnesses at the scene and took photographs of Garrison Road. Specifically, he took photos of Lucore's backpack and belongings left strewn across the road and of scuff and skid marks along the roadway left behind by vehicles and by Lucore's body and belongings as they dragged along the roadway as he was run over.

The pictures Barnette took upon arriving at the scene were turned over a few days later to the Vancouver Police Department's lead collision investigator, Officer Jeffery Starks, who also went to the scene to take additional photographs and measurements. He ultimately produced a total station scene diagram to determine and illustrate how the collision had occurred. Based on his training and experience as a collision investigator, Starks concluded that tire marks he

observed on the roadway and in pictures of the roadway from the day of the collision were acceleration marks. He concluded that none of the tire marks indicated any attempt to apply the brakes of the vehicle before or after it collided with Lucore. Starks also concluded that scuff and scrape marks on the roadway were the result of a pedestrian and buckles, backpacks, or belts being dragged along the roadway. He specifically noted that marks on the roadway from clothing were consistent with the clothing that Lucore was wearing on the day of the collision.

Starks' investigation ultimately led him to Gorham's home, where he noticed a dent in the front of Gorham's truck and, after speaking with Rigney and Guinette, had Gorham's truck impounded. He arrested Gorham. At the police station, Gorham informed Starks that he had experienced a bad weekend and had been involved in a fight.

While awaiting trial, Gorham placed telephone calls from the jail in which he made several statements regarding the incident. In one such call, he stated, in reference to the incident: "What I do, I do for a good fucking reason . . . [and I did] what I did for a good reason . . . and I got threatened." In another such call, he discussed interacting with his mother just prior to driving off after Lucore, stating: "She tried stopping me . . . I didn't stop. I mean – I can say this on the phone because I don't give a fuck right now. . . . [G]uy threatened me, so that's what happened and she already knows it." In several other calls he expressed an understanding that he had done something wrong and that he felt bad about the incident.

Gorham was charged with attempted murder in the first degree, hit and run driving, and assault in the first degree. During the trial, the State called several witnesses, including the aforementioned Martinez-Rodríguezes, various first responders, Lucore's doctors, Guinette, Rigney, Starks, and Lucore.

In the midst of Starks' testimony, the trial court excused the jury and held a CrR 3.5 hearing to determine the admissibility of Gorham's statement "I had a bad weekend. I got into a fight." Starks testified that he read Gorham his Miranda rights prior to asking him any questions. Starks further explained that he read the rights from a written form, which he then also had Gorham sign to acknowledge that Gorham had been read his rights and that he understood those rights. According to Starks, the form tracks the police department's standard Miranda rights language, but he did not specifically explicate that which constituted the department's standard Miranda language. Subsequently, Starks testified that Gorham signed the acknowledgement form and gave no indication that he did not understand his rights. The trial court ruled that the challenged statement was admissible. Defense counsel did not object to the ruling.[7]

During trial, the parties discussed proposed jury instructions with the trial court. Gorham proposed two lesser-included offense instructions, one for assault in the third degree and one for vehicular assault. When the trial court began discussing Gorham's proposed instructions, he asked Gorham's attorney if vehicular assault and assault in the third degree were lesser-included offenses of

---

[7] In fact, earlier in the proceedings, defense counsel stated that he had no problem with Starks testifying to the statement so long as Starks did not testify to Gorham's subsequent statement requesting a lawyer.

assault in the first degree. In response, Gorham's counsel stated, "I can't say that I agree on vehicular assault. It's something I'll look more into. Assault in the third degree, I think is a lesser-degree offense."[8]

When specifically asked for argument as to whether vehicular assault is a lesser-included offense of assault in the first degree, Gorham's counsel responded by stating, "What I would like to do, Your Honor, is simply offer it as an instruction still. I will let the Court make its ruling at this time. If I feel there is a need to posit an objection on the record, I shall do so." When the trial court subsequently declined to give a lesser-included instruction on vehicular assault, Gorham's lawyer objected by stating, "[F]or the record I will object to its not being included in the jury package that the jury will be able to consider, but that's all, Your Honor."

Following the presentation of evidence, the trial court instructed the jury and the parties presented their closing arguments. The defense admitted that Gorham had committed the hit and run but denied that he had intentionally run into Lucore with his truck. During the State's closing argument,[9] the following exchange occurred between the prosecutor, defense counsel, and the court:

> [MR. BARTLETT]: And then you have Helene Guinette and Richard Rigney. Now a person could say they would be biased, that they would be biased towards Mr. Gorham, but I submit that they came in and did their absolute best to tell the truth about what happened as well. They had every opportunity while this case was pending to, you know – and while they testified, to shade what they remembered to, you know, to give Mr. Gorham the benefit of the doubt where maybe he didn't deserve it. But instead, they came in

---

[8] The trial court ultimately gave the requested instruction on assault in the third degree.

[9] Prior to closing arguments, the jury was instructed that "[y]ou are the sole judges of the credibility of each witness. You are also the sole judges of the value or weight to be given to the testimony of each witness."

8

and quite ster – not sternly, but strongly, you know, stuck to the memory that they have today about what happened.

So when Mr. Gorham is telling you he had – that there was three 18-packs of beer and he had been drinking all day, weigh that against what his mother and Richard Rigney said, where they – his mother was adamant that he had worked that day. Would it have been easier for her to say, "Well, I could definitely be wrong about that today. I might not know if he worked that day or not. He perhaps had been drinking all day"? That would have been easy – that would have been the easy thing for her to do, but she told the truth, and she –

MR. RAMSAY: Objection, Your Honor; comment on the truth of what witnesses say.

THE COURT: You will determine what the truth is.

MR. BARTLETT: Correct. Well, obviously. Sorry, Your Honor.

She did her best to tell the truth and that was what she remembered, that on that – on the day in question, and she was adamant it was a Saturday and that's what all the testimony has been, it's been a Saturday, that Brandon worked, so he couldn't have been home drinking all day.

The jury found Gorham guilty on the assault in the first degree and hit and run charges but acquitted him on the attempted murder charge. Subsequently, the trial court sentenced Gorham to a standard range sentence of 124 months of confinement. Gorham then timely filed a notice of appeal to Division Two of the Court of Appeals, which transferred the matter to us for resolution.

II

Gorham contends that the State presented insufficient evidence to support his conviction for assault in the first degree, that the trial court erred by admitting a statement in violation of his Miranda rights, that the prosecutor engaged in misconduct during closing argument by giving the jury his personal opinion on

the credibility of a witness, that the trial court erred by declining to give a vehicular assault as a lesser-included offense instruction, and that the trial court improperly imposed a jury demand fee on Gorham. In response, the State contends that sufficient evidence supports Gorham's conviction for assault in the first degree, that sufficient evidence established that Gorham received his Miranda warnings, that the prosecutor did not commit misconduct because he never stated his personal opinion regarding the credibility of a witness, and that Gorham waived his right to appeal from the trial court's decision not to give a vehicular assault instruction. The State concedes that the trial court's decision to impose a jury demand fee must be reversed. Finding no merit to any of Gorham's other contentions, we remand for the trial court to strike the discretionary jury demand fee, but affirm the conviction.

A

Gorham first contends that insufficient evidence supports his conviction for assault in the first degree. This is so, Gorham asserts, because a constitutionally insufficient quantum of evidence established that he acted with the intent to inflict great bodily harm when he struck and ran over Lucore with his truck. We disagree.

"The test for determining the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992) (citing State v. Green, 94 Wn.2d 216, 220-22, 616 P.2d 628 (1980)). "This inquiry does not require the reviewing court

to determine whether *it* believes the evidence at trial established guilt beyond a reasonable doubt." Green, 94 Wn.2d at 221. "Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).

"A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom." Salinas, 119 Wn.2d at 201 (citing State v. Theroff, 25 Wn. App. 590, 593, 608 P.2d 1254, aff'd, 95 Wn.2d 385, 622 P.2d 1240 (1980)). A trier of fact "may infer criminal intent from a defendant's conduct where it is 'plainly indicated as a matter of logical probability.'" State v. Bright, 129 Wn.2d 257, 270, 916 P.2d 922 (1996) (quoting State v. Delmarter, 94 Wn.2d 634, 638, 618 P.2d 99 (1980)). In a sufficiency analysis, "[c]ircumstantial evidence and direct evidence carry equal weight." State v. Goodman, 150 Wn.2d 774, 781, 83 P.3d 410 (2004) (citing Delmarter, 94 Wn.2d at 638).

RCW 9A.36.011 sets forth the crime of assault in the first degree:

> (1) A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm:
> (a) Assaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death; or
> (b) Administers, exposes, or transmits to or causes to be taken by another, poison, the human immunodeficiency virus as defined in chapter 70.24 RCW, or any other destructive or noxious substance; or
> (c) Assaults another and inflicts great bodily harm.
> (2) Assault in the first degree is a class A felony.

11

Gorham concedes that the State presented sufficient evidence to establish each element of assault in the first degree except for the requirement of proof that Gorham acted with the intent to inflict great bodily harm. This is so, Gorham asserts, because the only evidence adduced by the State to prove Gorham's intent was Lucore's testimony that Gorham threatened to run him over with his truck. According to Gorham, this evidence is insufficient because Lucore admitted to being a paranoid schizophrenic who abused mind-altering drugs. However, such a contention is not a challenge to the sufficiency of the evidence so much as it is a disagreement with the jury's decision to credit Lucore's testimony instead of Gorham's.

The jury was the sole judge of the credibility of the evidence. State v. Camarillo, 115 Wn.2d 60, 71, 794 P.2d 850 (1990). The record is replete with evidence consistent with the jury's determination not to credit Gorham's testimony. Indeed, Gorham's testimony regarding how the incident occurred, whether there was a landscaping truck obscuring his view of Lucore, and whether he had been at home drinking all day or had gone to work, was all contradicted by the State's eyewitnesses to the incident, Guinette, and Rigney. In fact, Gorham contradicted his own testimony regarding his level of intoxication at the time of the incident. The jury did not lack for reasons to choose not to credit Gorham's testimony.

Furthermore, not only did the State present evidence of Gorham's direct verbal threat to run over Lucore with his truck, it also presented eyewitness testimony that Gorham accelerated to hit Lucore coupled with physical evidence

12

of tire acceleration marks (and the absence of brake marks) that together strongly support an inference that Gorham intentionally drove his truck into and over Lucore. Additionally, while awaiting trial, Gorham made statements over the telephone explaining that he ran over Lucore for a good reason, which further supports an inference that he intentionally struck Lucore with his truck. A constitutionally sufficient quantum of evidence supported the jury's verdict of guilt on the assault in the first degree charge.

B

Gorham next contends that the trial court erred by admitting his statement, "I had a bad weekend. I got into a fight." This is so, Gorham asserts, because insufficient evidence was presented during the CrR 3.5 hearing to show that Gorham had been properly advised of his Miranda rights. Specifically, Gorham contends that Officer Starks' testimony during the CrR 3.5 hearing that he had read Gorham "standard" Miranda rights from a written police form was legally insufficient and that without testimony as to the specific rights read, the challenged statement should have been excluded. In response, the State avers that the testimony presented by Starks was sufficient.[10]

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."

---

[10] The State also contends that Gorham waived his right to raise this issue on appeal because he did not object to the admission of the statement during the trial court proceedings. But the State has the burden of proving the voluntariness of Gorham's statements by a preponderance of the evidence. State v. Athan, 160 Wn.2d 354, 380, 158 P.3d 27 (2007). The trial court held a CrR 3.5 hearing to determine voluntariness, weighed the evidence presented, and ruled that Gorham's statement about having a bad weekend and getting into a fight was voluntary. Gorham may contest this ruling on appeal on the ground that the State presented insufficient evidence to meet its burden of proof.

To protect this right, the United States Supreme Court, in Miranda v. Arizona, set forth procedural requirements to protect suspects from the use of their involuntary statements against them at trial. See 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

> [A] suspect in custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires."

State v. Brown, 132 Wn.2d 529, 582, 940 P.2d 546 (1997) (quoting Miranda, 384 U.S. at 479). Failure to provide a suspect with any of the required Miranda warnings "results in exclusion of any statements given by the suspect." Brown, 132 Wn.2d at 582 (citing Oregon v. Elstad, 470 U.S. 298, 306-08, 105 S. Ct. 1285, 84 L. Ed. 2d 222 (1985)). "However, there is no requirement that the warnings be given in the precise language stated in Miranda." Brown, 132 Wn.2d at 582 (citing Duckworth v. Eagan, 492 U.S. 195, 202-04, 109 S. Ct. 2875, 106 L. Ed. 2d 166 (1989)). When the State asserts that the defendant waived his or her Miranda rights, the State "bears the burden of showing a knowing, voluntary, and intelligent waiver of Miranda rights by a preponderance of the evidence."[11] State v. Athan, 160 Wn.2d 354, 380, 158 P.3d 27 (2007).

The evidence adduced during the CrR 3.5 hearing herein satisfied the preponderance of the evidence standard. Officer Starks testified that he advised Gorham of his Miranda rights and that he did so by reading the Miranda rights

---

[11] A preponderance of the evidence means "more likely than not." See In re Marriage of Freeman, 169 Wn.2d 664, 673, 239 P.3d 557 (2010).

from a standard police form. The officer's uncontradicted testimony weighs in favor of an inference that the warnings required by Miranda were, in fact, provided to Gorham. The record does not provide any indication that the standard Miranda rights language utilized by Officer Starks was incomplete or that it did not comport with the requirements set forth in Miranda.[12] Indeed, defense counsel's ready acceptance of the standard language testimony and his decision not to challenge Officer Starks to delineate the specifics of the advisement read to Gorham strongly support the opposite inference—that Gorham's attorney knew that the warnings read from the standard police form referenced herein satisfied the requirements of Miranda.[13] Officer Starks testified that he advised the defendant of the required Miranda warnings. He further testified that he did so by resort to a standard form, created for this purpose. This evidence outweighed the contrary evidence adduced by Gorham—which was nothing. Thus, the evidence presented tended to prove that it was more likely than not that Gorham was informed of the required Miranda warnings and that his subsequent statement regarding his weekend encounter with Lucore was voluntary.

---

[12] During the CrR 3.5 hearing, Gorham's attorney had the opportunity to, but did not, ask Starks to specify the exact language of the warnings provided to Gorham. Nor did he contest their sufficiency.

[13] Perhaps when the language of Miranda warnings was freshly minted from the United States Supreme Court, the inference desired by Gorham would have been appropriate. However, it has been over 50 years since the advent of Miranda warnings, and their use has become ubiquitous in not only our nation's police departments and courtrooms, but also in cinema and television programming. Indeed, much of our case law refers to the Miranda warnings without specifically delineating the precise information required to be conveyed thereby. Thus, it is not obvious that Gorham's defense counsel, the trial judge, and everyone else in the courtroom, failed to comprehend what Starks meant when he testified that he used his department's standard Miranda warnings language.

C

Next, Gorham contends that the prosecutor engaged in misconduct while delivering his closing argument. This is so, he avers, because the prosecutor stated his personal opinion on the credibility of a witness. In response, the State asserts that, within the context of the closing argument, the comments Gorham identifies as the expression of a personal opinion are merely an expression of an inference drawn from marshalling the evidence. The State has the better argument.

"In closing argument, a prosecutor is afforded wide latitude to draw and express reasonable inferences from the evidence." State v. Reed, 168 Wn. App. 553, 577, 278 P.3d 203 (2012) (citing State v. Hoffman, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991)). However, "[i]mproper vouching occurs when the prosecutor expresses a personal belief in the veracity of a witness or indicates that evidence not presented at trial supports the testimony of a witness." State v. Thorgerson, 172 Wn.2d 438, 443, 258 P.3d 43 (2011) (citing State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010)). "A defendant claiming prosecutorial misconduct must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and circumstances at trial." State v. Miles, 139 Wn. App. 879, 885, 162 P.3d 1169 (2007). We review a prosecutor's conduct during closing argument "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given." State v. Russell, 125 Wn.2d 24, 85-86, 882 P.2d 747 (1994).

> It is not uncommon for statements to be made in final arguments
> which, standing alone, sound like an expression of personal

opinion. However, when judged in the light of the total argument, the issues in the case, the evidence discussed during the argument, and the court's instructions, it is usually apparent that counsel is trying to convince the jury of certain ultimate facts and conclusions to be drawn from the evidence. Prejudicial error does not occur until such time as it is clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion.

State v. Papadopoulos, 34 Wn. App. 397, 400, 662 P.2d 59 (1983).

Once a defendant establishes that a prosecutor's statements are improper, the defendant must establish actual prejudice. State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). "If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." Emery, 174 Wn.2d at 760 (citing State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009)).

Gorham contends that the prosecutor improperly expressed a personal opinion on the veracity of Guinette's testimony by remarking "but she told the truth" and "[s]he did her best to tell the truth." While these statements may—in isolation—appear to be improper, the addition of context shows them to be otherwise:

> [MR. BARTLETT]: And then you have Helene Guinette and Richard Rigney. Now a person could say they would be biased, that they would be biased towards Mr. Gorham, but I submit that they came in and did their absolute best to tell the truth about what happened as well. They had every opportunity while this case was pending to, you know – and while they testified, to shade what they remembered to, you know, to give Mr. Gorham the benefit of the doubt where maybe he didn't deserve it. But instead, they came in and quite ster – not sternly, but strongly, you know, stuck to the memory that they have today about what happened.
> So when Mr. Gorham is telling you he had – that there was three 18-packs of beer and he had been drinking all day, weigh that against what his mother and Richard Rigney said, where they – his

mother was adamant that he had worked that day. Would it have been easier for her to say, "Well, I could definitely be wrong about that today. I might not know if he worked that day or not. He perhaps had been drinking all day"? That would have been easy – that would have been the easy thing for her to do, but she told the truth, and she –

MR. RAMSAY: Objection, Your Honor; comment on the truth of what witnesses say.

THE COURT: You will determine what the truth is.

MR. BARTLETT: Correct. Well, obviously. Sorry, Your Honor.

She did her best to tell the truth and that was what she remembered, that on that – on the day in question, and she was adamant it was a Saturday and that's what all the testimony has been, it's been a Saturday, that Brandon worked, so he couldn't have been home drinking all day.

"[W]hen judged in the light of the total argument, the issues in the case, the evidence discussed during the argument, and the court's instructions," Papadopoulos, 34 Wn. App. at 400, it is apparent that the prosecutor herein was merely trying to convince the jury of the ultimate conclusion that Guinette's testimony was truthful. Specifically, the prosecutor highlighted an inference of truthfulness that the jury could draw from Guinette's refusal to change her recollection of events—that Gorham had gone to work on the day in question and had not spent the whole day drinking—in the face of cross-examination.

Furthermore, even if the prosecutor had improperly expressed his personal opinion, Gorham has failed to demonstrate prejudice that had a substantial likelihood of affecting the jury's verdict. Guinette's testimony that Gorham had not been drinking all day supported an inference that he was not intoxicated at the time of the incident. This inference was also supported by

Rigney's testimony regarding the amount of alcohol Gorham consumed that day and by Gorham's own testimony refuting that he was necessarily intoxicated even if he had been drinking a lot because he had developed "a pretty high alcohol tolerance." Given the other evidence, it is far from substantially likely that, had the prosecutor improperly commented on Guinette's credibility regarding Gorham's drinking, such comment affected the jury's verdict.

D

Gorham next contends that the trial court erred when it declined to give a jury instruction for vehicular assault as a lesser-included offense of the crime of assault in the first degree. Because Gorham did not properly preserve this claim of error for appeal, we decline to address the merits of his contention.

We generally will not consider an issue, theory, or argument not presented at trial. State v. McFarland, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995) (citing RAP 2.5(a)).[14] This includes any issue for which inadequate argument was presented to the trial court. Int'l Ass'n of Fire Fighters, Local 46 v. City of Everett, 146 Wn.2d 29, 36-37, 42 P.3d 1265 (2002). "To be adequate for appellate review, the argument should be more than fleeting." State v. Lazcano, 188 Wn. App. 338, 355, 354 P.3d 233 (2015).

CrR 6.15(c) amplifies this general rule by requiring that when a party objects to the "refusal to give a requested instruction" it "shall state the reasons

---

[14] Under RAP 2.5(a)(3), we may consider manifest errors raised for the first time on appeal that affect a defendant's constitutional rights, but the failure to instruct on a lesser-included offense does not constitute manifest constitutional error. State v. O'Hara, 167 Wn.2d 91, 101, 217 P.3d 756 (2009) (citing State v. Kwan Fai Mak, 105 Wn.2d 692, 745-49, 718 P.2d 407 (1986)).

for the objection." Our Supreme Court has cited this rule when refusing to review "asserted instructional errors to which no meaningful exceptions were taken at trial." State v. Scott, 110 Wn.2d 682, 686, 757 P.2d 492 (1988).

Although Gorham proposed a vehicular assault instruction and objected on the record when the trial court declined to give it, he presented no legal argument to support his proposed instruction. In fact, when the trial judge first asked Gorham whether vehicular assault and assault in the third degree were lesser-included offenses of assault in the first degree, counsel for Gorham stated, "I can't say that I agree on vehicular assault." When the trial judge subsequently asked counsel for Gorham to present argument in support of his requested vehicular assault instruction, counsel declined to do so. Similarly, he declined to explain his reasons for objecting when the trial court declined to give his requested instruction.[15] Because the record lacks any meaningful exception to the trial court's refusal to give Gorham's requested vehicular assault instruction, Gorham has waived his right to challenge that ruling on appeal.

E

Finally, Gorham contends, and the State concedes, that the trial court erred by imposing on Gorham a discretionary jury demand fee of $250.

In 2018, the law on legal financial obligations was changed to categorically

---

[15] The requirement that trial counsel present reasons for any objection assures that trial judges have the opportunity to correct any errors in proceedings. See State v. Strine, 176 Wn.2d 742, 749, 293 P.3d 1177 (2013) (quoting New Meadows Holding Co. v. Wash. Water Power Co., 102 Wn.2d 495, 498, 687 P.2d 212 (1984)). Waiting to explain the reasons for an objection until the case is on appeal denies the trial judge this opportunity. Thus, it is not sufficient for trial counsel to simply state an objection; counsel must also provide sufficient explanation supporting the objection to give the trial court a true opportunity to correct any alleged error.

prohibit the imposition of any discretionary legal financial obligations on indigent defendants. LAWS OF 2018, ch. 269, § 6(3). A jury demand fee is a discretionary cost that courts cannot impose on indigent defendants. RCW 10.01.160(2)-(3). Our Supreme Court has held that this change in the law applies prospectively to cases on appeal. State v. Ramirez, 191 Wn.2d 732, 747-50, 426 P.3d 714 (2018). The trial court herein determined that Gorham is indigent. Thus, it was improper for the trial court to impose the discretionary $250 jury demand fee. This assessment must be stricken on remand.

Affirmed in part, reversed in part, and remanded.

We concur: