**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

| | |
|---|---|
| STATE OF WASHINGTON, | No. 56305-3-II |
| Respondent, | |
| v. | |
| TAYLOR DANYELL STOKESBERRY, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, A.C.J.—In May 2020 a fire broke out at Mark Stokesberry's[1] home. Until shortly before the fire, Mark's daughter, Taylor Stokesberry, lived with Mark and with her boyfriend, Jacob McClellan, in Mark's home. Stokesberry moved out with McClellan one to two weeks before the fire, when Mark evicted McClellan due to McClellan's threatening behavior.

The day of the fire, Stokesberry returned to Mark's home to pick up some things, and was accompanied by Melesa Larson. Mark's neighbors saw Stokesberry and Larson arguing in the yard, and believed Stokesberry was lighting a barbecue grill. Shortly thereafter, both Mark and his neighbors heard a loud noise and then saw that Mark's home was on fire. Mark and his neighbors also saw Stokesberry running away from the home. A jury found Stokesberry guilty of first degree arson for setting fire to Mark's home.

---

[1] Because Mark Stokesberry shares a last name with Taylor Stokesberry, we refer to Mark by his first name to avoid confusion, while referring to Taylor Stokesberry by her last name.

Stokesberry now appeals her conviction, arguing (1) that the trial court improperly refused to admit evidence of Larson's alleged involvement in prior fires, (2) that the trial court improperly denied her motion for a mistrial following the jury's exposure to an unredacted 911 call, (3) that the prosecutor committed misconduct by misstating the law in the State's closing argument, and (4) that these errors cumulatively denied her a fair trial. For the reasons discussed below, we affirm Stokesberry's conviction.

FACTS

I. UNDERLYING INCIDENT

On May 23, 2020, a fire broke out at Mark's home in Tacoma. The fire originated in Mark's carport outside the home, underneath a desk. The fire was identified as "incendiary," meaning started by a person, but was not likely to be started using an accelerant. Verbatim Report of Proceeding (VRP) (Sept. 15, 2021) at 294.

Mark's daughter, Stokesberry, and her boyfriend, McClellan, lived with Mark at Mark's home from around February 2019 until May 2020. During that time, Mark witnessed McClellan yelling, getting drunk, and hurting Stokesberry. On one occasion, three or four months before the fire, McClellan "was out on the front walk with a baseball bat, screaming threats and banging on the doors and trying to get back in the house. And the neighbors called the police." VRP (Sept. 13, 2021) at 38. The baseball bat used in this incident, which was later confiscated by police, apparently belonged to Melesa Larson,[2] and was a gift from her grandfather. Mark was

_____

[2] Larson is also referred to as Lisa throughout the proceedings.

embarrassed that the neighbors could hear "the screaming in the yard and the constant fighting." VRP (Sept. 13, 2021) at 86.

A week or two before the fire, Mark obtained a restraining order against McClellan, effectively evicting him from the home. Mark chose this course of action because of McClellan's threatening behavior. When Mark evicted McClellan, McClellan responded with threats to Mark, and Stokesberry told Mark that he would regret it.

On the afternoon of the fire, Stokesberry and Larson arrived at Mark's home, where Mark allowed Stokesberry inside to get some things. At Mark's request, Larson did not enter the house. Mark recorded his interaction with Stokesberry, and on the recording, Stokesberry said "she [Larson] can come in, she's the one that's going to burn your house down." VRP (Sept. 13, 2021) at 52.

After Stokesberry exited the home, Mark heard a popping noise[3] and saw Stokesberry through the window, running away from the home. Shortly thereafter, Mark realized his home was on fire, exited the home, and sprayed water on the fire with his garden hose. Stokesberry was charged by amended information with arson in the first degree and conspiracy to commit arson in the first degree. She was later convicted by a jury of first degree arson[4] for setting this fire.

## II. PRETRIAL EVIDENTIARY RULING

At some point prior to trial, Stokesberry advised the State that the defense intended to argue that another suspect, Larson, committed the arson. The State did not object to the presentation of

---

[3] The fire investigator explained this noise was probably caused by a sealed gas canister building up pressure due to radiant heat.

[4] Stokesberry was acquitted of conspiracy to commit arson.

the other suspect theory, but moved to exclude any evidence of prior bad acts on the part of Larson.[5] Specifically, the State moved to exclude evidence pertaining to four fires that Larson was investigated in relation to, occurring on June 8, 2020, March 29, 2020, August 31, 2019, and February 16, 2017. Stokesberry sought admission of this evidence to show that Larson acted alone in starting the fire and that Stokesberry was neither involved in starting the fire nor in conspiring with Larson to start the fire.

The first fire for which Larson was investigated, in 2017, occurred at an abandoned building and was determined by a fire inspector to be accidental. However, during the investigation a witness claimed Larson threw a Molotov cocktail at the scene of that fire. The second fire, in 2019, occurred when Larson "lit a blanket on fire and dragged it towards a vehicle after a verbal dispute." Clerk's Papers (CP) at 97. Larson pled guilty to reckless burning in relation to that fire. *Id*. The third fire, in March 2020, occurred when Larson "use[d] a flip lighter to melt two spots of siding on [a] building." *Id*. While investigating the fourth fire, a garbage fire in June 2020, police spotted Larson one to three feet away from the fire and found butane and a lighter in Larson's bag.

Following briefing and argument on the motion, the trial court entered a written order granting the State's motion to exclude evidence of Larson's alleged prior bad acts. The court concluded that the incidents from June 8, 2020 and February 16, 2017 attributed to Larson had not been proven by a preponderance of the evidence. The court further concluded that the other two incidents attributed to Larson, the August 2019 fire and the March 2020 fire, were proven by a

---

[5] Stokesberry presented her other suspect theory of the case to the jury and testified, without objection from the State, that she had "heard many people say that [Larson is] known to burn certain things around the city," had "witnessed Lisa set a shopping cart on fire," and had heard Larson threatening to burn Mark's home down. VRP (Sept. 16, 2021) at 361-62.

preponderance of the evidence. However, the court concluded that these prior incidents were being offered as propensity evidence, which is barred by ER 404(b). The court further ruled that the prior acts "minimal probative value" because they were "very attenuated and do not share any similar characteristics to the fire at issue" in this case. CP at 99.[6] Finally, the court ruled that even if these incidents were not being offered as propensity evidence, they would still be inadmissible because their probative value was substantially outweighed by their prejudicial effect. Neither party has challenged the factual findings contained within this order.

III. TRIAL

Stokesberry was tried by a jury in September 2021, and was found guilty of first degree arson but not guilty of conspiracy to commit arson. At trial, Stokesberry's defense theory was that Larson acted alone in starting the fire, and that the neighbors' biases against Stokesberry contributed to a narrative that blamed her for the fire. To that end, Stokesberry presented evidence of Larson's presence at the scene before and after the fire, as well as Larson's knowledge of the home. She also testified, without objection from the State, that Larson wanted to set fire to Mark's home to get back at him for kicking McClellan out, and that Larson was angry because her baseball bat was confiscated by police when Mark called the police on McClellan. Furthermore, she testified, without objection, that she had "heard many people say that [Larson]'s known to burn certain things around the city," had "witnessed [Larson] set a shopping cart on fire," and had heard Larson threatening to burn Mark's home down. VRP (Sept. 16, 2021) at 361-62.

---

[6] Regarding the two incidents the trial court found had not been proven by a preponderance of the evidence, the court ruled that those incidents, even if they *had* been proven, were inadmissible for the same reasons that the other two incidents were inadmissible.

The State's witnesses included LZ,[7] a neighbor who was 12 at the time of the fire, as well as LZ's mother, SZ. LZ testified that she was outside in her yard just before the fire broke out, and while there, she heard Stokesberry and one other person speaking in Mark's yard. She heard the other person say "Taylor, don't do it" and then heard Stokesberry say "Lisa" in response, which is a nickname for Larson. VRP (Sept. 13, 2021) at 147. LZ then went inside to tell her parents about Stokesberry's presence, because she was afraid. LZ saw Stokesberry doing something that looked like barbecuing, then a few minutes later heard a loud explosion and saw the house on fire.

SZ largely corroborated what LZ said. SZ also shared that she had heard Stokesberry threaten to light the home on fire about five times within the year before the fire, including the week before the fire. She also heard "a lot of shouting and yelling" at the Stokesberry home and stated that she called the crisis line in response. VRP (Sept. 14, 2021) at 148.

Although GZ, LZ's father, did not testify, the court admitted an audio recording of his May 23, 2020, 911 call into evidence as Exhibit 85, upon the parties' stipulation. When the prosecutor first tried to play the call for the jury, he could not do so because of technical difficulties. The second time the prosecutor attempted to play Exhibit 85, he stopped the exhibit after realizing that the version he was playing was unredacted. The jury was inadvertently exposed to the portion of the call where GZ stated, "if you check the 9-1-1 records and non-emergency, we've had the cops out a bunch lately. They had a big fight." App. A to Resp't's Mot. to Suppl. the R. at 5. Stokesberry's attorney chose not to object immediately, not wanting to draw more attention to the exhibit.

---

[7] Because LZ is a minor, we refer to her by her initials. We also refer to LZ's parents by their initials.

The court was not made aware of the error at the time it was initially played for the jury; instead, the State proceeded with its next witness. After being informed of the error, and upon Stokesberry's motion for a mistrial, the court determined that the error did not merit a mistrial and invited the parties to draft limiting instructions. VRP (Sept. 15, 2021) at 264-70. Stokesberry did not, however, propose a limiting instruction. Additionally, the court recognized that "anything that's going to go back to the jury, it should be properly redacted because they'll replay the thing over and over again." VRP (Sept. 15, 2021) at 264. The court therefore determined that the redacted version should be admitted as Exhibit 85A. Before playing Exhibit 85A for the jury, the court explained that the jury was to disregard Exhibit 85.

The State, in its closing argument, described accomplice liability by stating,

Instruction No. 12 tells you what an accomplice is and a person is an accomplice as in Ms. Stokesberry -- or sorry, [Larson] is an accomplice and Ms. Stokesberry is an accomplice to [Larson]'s crime if he or she solicits, commands, encourages or requests another person to commit the crime or aids or agrees to aid another person in planning or committing the crime.

. . . .

So it's the state's position that Ms. Stokesberry started this fire. But again, the defense is going to argue that [Larson] was the one that started the fire, so the question for you as the jury is if you decide or *if you believe for a second* that [Larson] was the one that started the fire. She is an accomplice. And in this case she is. She's here present at the scene and ready to assist by aiding in her presence.

VRP (Sept. 20, 2021) at 470-71 (emphasis added).

Upon hearing this characterization, the court interjected sua sponte,

I need to correct something. The issue is not whether or not Ms. Larson is an accomplice. The issue is whether or not Ms. Stokesberry is an accomplice of Ms. Larson with that version of the events and so it's an important distinction.

No. 56305-3-II

VRP (Sept. 20, 2021) at 471. The State then changed course in response to the court's interjection, arguing,

> Okay. Lets talk about Ms. Stokesberry acting as an accomplice. Ms. Stokesberry can act as an accomplice if she aids or agrees to aid in another person in planning or committing the crime.
>
> So is she helping [Larson] commit this crime and is she present at the scene and ready to assist, is she giving words, acts, encouragement, support or her presence there? And the answer is yes. She's there -- Ms. Stokesberry's there inside the residence. *If you believe for a second* that Ms. Larson is the one that caused the fire, Ms. Stokesberry's presence there serves as a distraction, and she knows -- according to her testimony, she knows that Ms. Larson is there to commit a fire, Ms. Larson has threatened to do so, and she is there distracting Mr. Stokesberry.
>
> . . . .
>
> Now, all of this conspiracy, accomplice liability is only under consideration if defense's theory of the case, that is that Ms. Larson started this fire, is taken into serious consideration by you, the jury. Because what that means is, again, some of you may decide that Ms. Stokesberry started the fire, some of you may decide that Ms. Larson started the fire, but either way, if one or the other acting as an accomplice to the other, they are guilty of the crime of arson in the first degree.

VRP (Sept. 20, 2021) at 471-74 (emphasis added).

After the State's closing argument, but before delivering her own, Stokesberry's counsel objected to the language "if you believe for a second that it was Lisa who started the fire" on the grounds that it misstated the law because an abiding belief must be long lasting. VRP (Sept. 20, 2021) at 477. It appears the court misunderstood the nature of Stokesberry's objection, instead remarking "I thought there was some confusion, potentially, with respect to accomplice liability," Stokesberry's attorney responded, "I would have made note of that here, but Your Honor put that on the record. I'll preserve our objection for that." VRP (Sept. 20, 2021) at 477-78. No ruling was made as to these objections.

8

Stokesberry's closing argument focused on the idea that Mark's neighbors were biased against Stokesberry, and they assumed from the start that she was responsible for the fire when really the fire was set by Larson alone. Stokesberry argued that Larson's motive was to retaliate against Mark for kicking McClellan out of his home and causing the loss of Larson's baseball bat by calling the police on McClellan when McClellan used the bat threateningly. Stokesberry further argued that she did not have a motive, and that she was trying to warn her father of Larson's plan.

The jury found Stokesberry guilty of first degree arson and not guilty of conspiracy. Stokesberry now appeals.

## ANALYSIS

Stokesberry argues that the trial court abused its discretion and violated her right to present a defense in excluding her proposed evidence about Larson's alleged involvement in prior fires. She also argues that the trial court erred by denying her motion for a mistrial because the jury was exposed to an unredacted version of a 911 call. Further, Stokesberry argues that the prosecutor's closing argument contained misstatements of the law that merit reversal. Finally, she argues that these errors cumulatively deprived her of a fair trial.

The State responds that Stokesberry's proposed prior bad acts evidence was properly excluded because Larson's possible involvement in other, prior arsons was not relevant and constituted inadmissible propensity evidence under ER 404(b). It further argues that the court properly denied Stokesberry's motion for a mistrial because the content of the call was not seriously prejudicial, the content was cumulative of other evidence, and the error was immediately and effectively remedied. It next argues that Stokesberry failed to timely object or request any remedy for the alleged prosecutorial misconduct, and that she has not met her burden of showing

that the errors were so flagrant and ill-intentioned that a curative instruction could not have cured any prejudice. Finally, it argues that the cumulative error doctrine does not apply.

We affirm Stokesberry's conviction. The prior bad acts Stokesberry wanted to introduce did not tend to connect Larson with the fire at the Stokesberry home, and were therefore irrelevant and properly excluded. Moreover, the court's denial of Stokesberry's motion for a mistrial was not an abuse of discretion. Further, any misstatements of the law in the prosecutor's closing argument were insufficiently prejudicial to reverse on that ground. Finally, cumulative error does not merit reversal.

## I. EXCLUSION OF EVIDENCE RELATED TO PAST FIRES

A. Standard of Review

In considering a claim of error related to the exclusion of evidence sought to be introduced by a criminal defendant, reviewing courts conduct a "two-step review process." *State v. Arndt*, 194 Wn.2d 784, 797, 453 P.3d 696 (2019). First, a trial court's evidentiary rulings are reviewed for abuse of discretion. *State v. Jennings*, 199 Wn.2d 53, 58, 502 P.3d 1255 (2022). If an abuse of discretion is found and the error is not harmless, reversal is required and we need not examine the constitutional question. *Id* at 59. However, if an abuse of discretion is not found, or an abuse of discretion is found but deemed harmless, we then consider the constitutional question of whether these rulings violated a defendant's Sixth Amendment right to present a defense is considered de novo. *Id.*; *Arndt*, 194 Wn.2d at 797-98.

B. Evidentiary Ruling

*1. Legal Principles*

Generally, evidence must be relevant to be admissible. ER 402. Even if relevant, evidence is inadmissible if it is prohibited by a rule of evidence, or if its probative value is substantially outweighed by another consideration such as the danger of unfair prejudice. ER 402, 403.

In the first step of our analysis, we must determine whether the trial court abused its discretion in excluding evidence. *Jennings*, 199 Wn.2d at 59. We will find an abuse of discretion "when no reasonable person would take the view adopted by the trial court." *State v. Atsbeha*, 142 Wn.2d 904, 914, 16 P.3d 626 (2001).

When evaluating a defendant's proposed "other suspect evidence," the trial court examines the evidence sought be admitted under the general rule set forth in ER 403. *State v. Franklin*, 180 Wn.2d 371, 378, 325 P.3d 159 (2014). Other suspect evidence is admissible only if the defendant shows "a train of facts or circumstances as tend clearly to point out some one besides the [accused] as the guilty party." *State v. Downs*, 168 Wn. 664, 666, 13 P.2d 1 (1932). The proper test is whether "some combination of facts or circumstances . . . point[s] to a nonspeculative link between the other suspect and the charged crime." *Franklin*, 180 Wn.2d at 381. "The standard for relevance of other suspect evidence is whether there is evidence tending to connect someone other than the defendant with the crime." *Id.* (internal quotation marks omitted).

ER 404(b) provides, "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan,

11

knowledge, identity, or absence of mistake or accident." Before admitting evidence of prior

misconduct, a trial court must, on the record,

> (1) find by a preponderance of the evidence that the misconduct occurred, (2) identify the purpose for which the evidence is sought to be introduced, (3) determine whether the evidence is relevant to prove an element of the crime charged, and (4) weigh the probative value against the prejudicial effect.

*State v. Gresham*, 173 Wn.2d 405, 421, 269 P.3d 207 (2012) (quoting *State v. Vy Thang*, 145

Wn.2d 630, 642, 41 P.3d 1159 (2002)). "The third and fourth elements ensure that the evidence

does not run afoul of ER 402 or ER 403, respectively." *Gresham*, 173 Wn.2d at 421.

*2. Application*

Here, the trial court did not exclude or prevent Stokesberry from presenting her theory that

another suspect—Larson—committed the arson and that Larson acted alone. Indeed, Stokesberry

testified, without objection, that she had "heard many people say that [Larson]'s known to burn

certain things around the city," had "witnessed [Larson] set a shopping cart on fire," and had heard

Larson threatening to burn Mark's home down had been involved in other fires. VRP (Sept. 16,

2021) at 361-62. Moreover, defense counsel argued, without objection, that Larson started the fire

"to get back at Mark Stokesberry for taking the baseball bat and kicking Jacob out" and that Larson

was acting alone because Stokesberry tried to warn Mark of Larson's plan. Our review, therefore,

is limited to whether the trial court abused its discretion in excluding evidence of Larson's alleged

involvement in the fires that occurred in August 2019 and March 2020.[8]

---

[8] As we note above, the trial court determined that Larson's involvement in the fires occurring in February 2017 and June 2020 were not proven by a preponderance of the evidence. Stokesberry does not argue in this appeal that the trial court erred in making that determination. Thus, we need not consider those two acts in our analysis of her claim. *See* RAP 10.3(a)(6).

Here, the trial court properly concluded first, that evidence of Larson's possible involvement with prior fires was irrelevant, and second, that even if relevant, it was inadmissible pursuant to ER 404(b).

As other suspect evidence, this evidence would be relevant only if it tended to connect Larson with the fire that occurred at the Stokesberry home on May 23, 2020. *Franklin*, 180 Wn.2d at 381. The prior fires did not share significant similarities with the May 23, 2020 fire: they involved allegedly using a lighter to melt the siding of a building and lighting a blanket on fire and dragging it toward another's vehicle. Without some evidence that the commission of the prior fires bore at least some similarity to May 23, 2020 fire, the evidence did not bear even minimal probative value.

Moreover, the evidence is barred by ER 404(b) because Stokesberry baldly intended to use Larson's prior bad acts "to show action in conformity therewith," not for some other purpose. ER 404(b). Stokesberry specifically argued that Larson's prior bad acts were relevant to show that "Ms. Larson was acting *consistent with fires she has started in the past* – alone." CP at 92 (Def.'s Resp. to State's Mot. to Prohibit Other Suspect Evid.) (emphasis added). In addition to affirming the trial court's conclusion that this evidence was irrelevant, we hold that the evidence, even if relevant, was properly excluded under ER 404(b).

C. Right to Present a Defense

*1. Legal Principles*

Defendants have a constitutional right to present a defense. CONST. art. I, § 22; U.S. CONST. amend. VI. "However, the Constitution permits judges to 'exclude evidence that is repetitive . . . , only marginally relevant or poses an undue risk of harassment, prejudice, [or] confusion of the

issues.'" *Jennings*, 199 Wn.2d at 63 (quoting *Holmes v. S. Carolina*, 547 U.S. 319, 326-27, 126 S. Ct. 1727, 164 L. Ed. 2d 503 (2006)).

The right to present a defense is balanced against the State's interest in excluding prejudicial evidence. *Jennings*, 199 Wn.2d at 63; *see also State v. Hudlow*, 99 Wn.2d 1, 16, 659 P.2d 514 (1983). Where the excluded evidence is highly relevant, "it appears no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and Const. art. 1, § 22." *Id.* at 16. However, where the excluded evidence has at least minimal relevance, reviewing courts consider whether "the defendant had the opportunity to present [their] version of the incident, even if some evidence was excluded." *Jennings*, 199 Wn.2d at 66. If the excluded evidence would have bolstered the defendant's argument, but was not essential to the argument, the defendant's right to present a defense may be outweighed by the State's interest in avoiding prejudice. *Id.* at 67.

*2. Application*

At the outset, we must again emphasize that Stokesberry was permitted to introduce her theory that Larson committed the crime, along with testimony and argument that supported this theory. The issue before us is whether Stokesberry was denied her constitutional right to present a defense when the trial court excluded a narrow subset of evidence about two prior acts by Larson that was intended solely as propensity evidence.

Here, the evidence of Larson's alleged prior bad acts is minimally relevant, so we must balance any prejudice to the state against Stokesberry's right to present a defense. The other suspect evidence Stokesberry was permitted to present was much more probative of whether Larson had the opportunity, motive, and ability to commit the arson. For example, Stokesberry

was allowed to testify that Larson had made specific threats to burn Mark's home down, that she had witnessed Larson start a fire in the past, and that she had heard of Larson's reputation for setting fires. The excluded evidence, by contrast, was marginally relevant at best, and risked prejudicing the State by inviting the jury to improperly rely on propensity evidence. Because the excluded evidence was of minimal probative value, and its exclusion did not impair Stokesberry's ability to argue her other suspect theory of the case, Stokesberry's interest in presenting this evidence does not outweigh the State's interest in avoiding prejudice. We therefore hold that Stokesberry was not deprived of her constitutional right to present a defense.

## II. UNREDACTED 911 CALL

Stokesberry contends that the trial court abused its discretion when it denied her motion for a mistrial following the inadvertent playing to the jury of an unredacted 911 call. Stokesberry complains about the portion of the call in which the caller said "if you check the 9-1-1 records and non-emergency, we've had the cops out a bunch lately. They had a big fight." App. A to Resp't's Mot. to Suppl. the R. at 5. Stokesberry argues that this remark suggested she had a propensity to commit arson and that the instruction given by the trial court was inadequate to remedy the prejudicial effect of the remark.

The State responds that the trial court properly denied the motion for a mistrial because the playing of this portion of the 911 call was "not a serious irregularity that materially affected the outcome of the trial," because it was cumulative of other evidence and did not reference other criminal conduct or suggest a propensity to commit the current crime, and because the jury was properly instructed to disregard the evidence. Br. of Resp't at 16. For the reasons discussed below,

15

we agree that the trial court did not abuse its discretion when it denied Stokesberry's motion for a mistrial.

A. Legal Principles

We review a trial court's denial of a motion for mistrial for abuse of discretion. *State v. Emery*, 174 Wn.2d 741, 765, 278 P.3d 653 (2012). Abuse of discretion occurs if the trial court's decision is manifestly unreasonable or based on untenable grounds. *State v. Dye*, 178 Wn.2d 541, 548, 309 P.3d 1192 (2013). We reverse only if, viewed within the context of all the evidence, the improper evidence was so prejudicial that the defendant did not get a fair trial. *State v. Gamble*, 168 Wn.2d 161, 177, 225 P.3d 973 (2010). This requires examining (1) the seriousness of the prejudice; (2) whether the improperly introduced evidence was cumulative; and (3) the trial court's instruction that the jury disregard the improper evidence. *State v. Hopson*, 113 Wn.2d 273, 284, 778 P.2d 1014 (1989).

The *Hopson* case illustrates each factor in the analysis. *See id.* Under the first factor, a witness's reference to when Hopson "went to the penitentiary last time" was not serious enough to materially affect the outcome of the trial because it included "no information concerning the nature or number of prior convictions" and because the record contained "overwhelming evidence" of the defendant's guilt. *Id.* at 276, 286. Under the second factor, there was evidence elsewhere in the record showing that Hopson had a criminal history. *Id.* at 286. Under the third factor, the trial court properly instructed the jury to disregard the improper statement. *Id.* at 287. Because all three factors weighed against reversal, the Supreme Court in *Hopson* concluded that the trial court did not abuse its discretion when it denied the defendant's motion for a mistrial. *Id.* at 287.

B. Application

Here, applying the three *Hopson* factors shows that the trial court's denial of Stokesberry's motion for a mistrial was not an abuse of its discretion. First, publishing the portion of the 911 call where GZ stated, "if you check the 9-1-1 records and non-emergency, we've had the cops out a bunch lately. They had a big fight" was not seriously prejudicial to Stokesberry. App. A to Resp't's Mot. to Suppl. the R. at 5. This statement reveals merely that there had been fighting at the Stokesberry's home and that police had responded to the scene. The connection between the information in the call and any details about Stokesberry's behavior during prior police calls is nebulous at best. And in the context of the entire record, this statement is unlikely to have swayed the jury.

Second, the statements in GZ's 911 call were cumulative of other evidence, including of Stokesberry's own testimony. SZ testified that there was "a lot of shouting and yelling" at the Stokesberry home and stated that she called the crisis line in response. VRP (Sept. 14, 2021) at 148. Mark testified that he was embarrassed because the neighbors could hear "the screaming in the yard and the constant fighting" and that police had responded to the home. VRP (Sept. 13, 2021) 86. And Stokesberry herself testified that neighbors heard the frequent arguing and that the police were called.

Third, the error was remedied when the trial court instructed the jury to disregard what they had heard and the prosecutor then played the redacted call. The challenged portion of the call was not discussed in front of the jury, and the court "minimized its impact by moving the trial along." *Hopson*, 113 Wn.2d at 287. "Jurors are presumed to follow instructions." *Id.* at 287. Therefore,

17

because no portion of this analysis suggests the trial court abused its discretion, the trial court properly denied Stokesberry's motion for a mistrial.

### III. PROSECUTORIAL MISCONDUCT

Stokesberry challenges five remarks made by the prosecutor in closing argument. In two of the remarks, Stokesberry contends, the State misstated the beyond a reasonable doubt standard by suggesting that the jury's belief in Stokesberry's guilt could be fleeting rather than long lasting ("abiding"), and in three of the remarks, Stokesberry argues, the prosecutor's remarks misstated the law on accomplice liability. Br. of Appellant at 35. Each of these claims is meritless.

#### A. Legal Principles

To establish prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial. *Emery*, 174 Wn.2d at 756. If a defendant fails to object to the alleged misconduct during trial, they are "deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice." *Id.* at 760-61. If, on the other hand, a timely objection is made, then the defendant must show that the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *Id.* at 760, 763.

#### B. Application

##### i. *Temporal Misstatement of Reasonable Doubt*

The prosecutor made the following two remarks during closing argument that Stokesberry challenges: First, the prosecutor said "but again, the defense is going to argue that [Larson] was the one that started the fire, so the question for you as the jury is if you decide or if you believe for

18

a second that [Larson] was the one that started the fire." VRP (Sept. 20, 2021) at 470-71. Second,

the prosecutor said:

> If you believe for a second that Ms. Larson is the one that caused the fire, Ms. Stokesberry's presence there serves as a distraction, and she knows - - according to her testimony, she knows that Ms. Larson is there to commit a fire, Ms. Larson has threatened to do so, and she is there distracting Mr. Stokesberry.

VRP (Sept. 20, 2021) at 472.

Stokesberry did not object to either the prosecutor's initial remark (which, if she had, would have alerted both the State and the trial court to her belief that the State had misstated the law) or to the second remark at the time they were made. Rather, she waited until after the State completed its closing argument to lodge her objection. The court made no ruling on the objection, nor did Stokesberry ask the trial court to make a ruling. Additionally, Stokesberry did not ask for a curative instruction.

Even assuming without deciding that Stokesberry timely objected and did not waive her claim, Stokesberry fails to show either that the prosecutor's remarks were improper or a substantial likelihood that the remarks affected the verdict.

Stokesberry argues that the State misstated the reasonable doubt standard when it used the term "believe[d] for a second" when referring to whether it was Larson, rather than Stokesberry, who started the fire. VRP (Sept. 20, 2021) at 472. But in context, the prosecutor was discussing the legal principle that if the jury found that Stokesberry and Larson acted as accomplices, it was immaterial who actually started the fire. The remarks were not temporal in nature and did not suggest that the jury could convict Stokesberry if it had less than an abiding belief in the truth of the charge. Moreover, Stokesberry has not shown a substantial likelihood these remarks affected

the jury's verdict. The jury acquitted Stokesberry of conspiracy to commit arson, so it is unlikely that it applied an incorrect interpretation of "abiding belief" to its determination of Stokesberry's guilt. CP at 182.

ii. *Accomplice Liability*

As to the accomplice liability statements, the prosecutor's fleeting confusion between Larson and Stokesberry did not constitute a misstatement of law. Stokesberry argues that "[t]he confusion likely led [the jury] to believe Taylor Stokesberry could be guilty of Arson in the First Degree as an accomplice to the uncharged Melesa Larson." Br. of Appellant at 42. But this is precisely what accomplice liability means. As the jury was instructed, "[a] person is guilty of a crime if it is committed by the conduct of another person for which he or she is legally accountable. A person is legally accountable for the conduct of another person when he or she is an accomplice of such other person in the commission of the crime." CP 173.[9] It is not clear what Stokesberry believes constitutes a misstatement of law.

Further, even if there had been a misstatement of law, Stokesberry again fails to show prejudice. To the extent there was a misstatement, the court interjected and corrected it sua sponte. Additionally, it is persuasive that the jury acquitted Stokesberry of conspiracy to commit arson. This suggests that the jury did not believe beyond a reasonable doubt that there was an agreement between Larson and Stokesberry. Stokesberry has not explained how any alleged confusion about accomplice liability contributed to her guilty verdict where the jury did not believe there was a

---

[9] To the extent Stokesberry meant to suggest that one can only be convicted as an accomplice if the principal actor was also charged with the crime, that is not the law and Stokesberry provides no authority for such an assertion.

conspiracy between Stokesberry and Larson. The record, taken as a whole, does not demonstrate a substantial likelihood that any misstatement by the prosecutor affected the jury's verdict. Thus, we reject Stokesberry's prosecutorial misconduct claim.

## IV. CUMULATIVE ERROR

Finally, Stokesberry argues that cumulative error deprived her of her right to a fair trial. Where multiple errors combine to deprive the defendant of a fair trial, the cumulative error doctrine requires reversal. *State v. Lazcano*, 188 Wn. App. 338, 370, 354 P.3d 233 (2015). But it is the defendant's burden to prove "an accumulation of error of sufficient magnitude to warrant a new trial." *Id.* at 370. Here, Stokesberry has failed to prove any errors that were sufficiently prejudicial to warrant a new trial, whether considered in isolation or collectively. We affirm Stokesberry's conviction for first degree arson.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Cruser, A.C.J.

We concur:

Maxa, J.

Veljacic, J.

21