IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>              Respondent,<br><br>          v.<br><br>XIONG, YEE,[†]<br><br>              Appellant. | No. 87763-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Yee Xiong appeals his conviction for burglary in the second degree. He argues the State failed to provide sufficient evidence concerning intent. Finding no error, we affirm.

FACTS

On February 24, 2024, around 2:00 a.m., a silent alarm motion sensor was triggered at the Mukilteo School District Transportation lot in Everett, Washington. Grant Lawson, an employee of the security company monitoring the lot, reported the intrusion to law enforcement and to Jeffrey True, a senior Mukilteo School District employee responsible for caring for and securing the district's maintenance vehicles.

---

[†] The appellant's name appears in the trial court caption with his family surname first, followed by his given first name, separated by a comma. We note that this presentation differs from the usual convention, in which parties' names appear with their given first name followed by their family surname. There is no discernable reason for this different treatment. See Robert S. Chang, Cecily C. Hazelrigg & Linda C. Lee, *"That's Not My Name": The Linguistic Violence of Misnaming Parties in Court Proceedings*, 100 Wash. L. Rev. 687, 707-10 (2025) (discussing different treatment of certain names in case titles, including Asian names, and the effect of marking such litigants as different).

The security system included cameras that allowed Lawson to access a live video feed of the lot once the alarm was triggered. Lawson testified to what he saw on the live video feed, that "it was dark," but he could see one person whose "build was male; around 6-foot, maybe a touch under; but all dark clothing, and it looked like they were carrying something metallic in their hand, kind of long, possibly a weapon." Lawson also noted that the person appeared to be wearing a white hat.

At trial, a six-second surveillance video that Lawson had viewed, was played for the jury. The video, which was filmed from a surveillance camera behind and above the scene, depicted five white vans parked next to each other, backed into separate parking spots. Lawson confirmed that the video was of the transportation lot, but he could not pinpoint what area of the property it showed. Lawson also recalled that he "distinctly saw a person moving around the vehicles." Initially, when Lawson testified to what he saw on the live video feed, he said he did not see a person walking between the vans or on the other side of the vans. However, after reviewing the surveillance video, Lawson agreed that it appeared an individual came "from around the other side of the van." He also testified that the individual appeared to "hang around" the two vehicles for about 60 seconds. Lastly, Lawson testified that the alarm system "was disarmed for a few hours the night before the incident [on February 23, 2024,] before it was armed again" due to maintenance or construction occurring on the lot.

After being notified of the triggered alarm by Lawson, True was the first to arrive at the lot. While he waited for the police, True did not notice any individuals in or around the lot. When police arrived, True opened the access gate and they entered the lot. When inside, True checked the vehicles on the north side of the lot but did not notice

2

anything suspicious. However, after officers arrived, they notified him that a vehicle on the east side of the lot appeared to be tampered with. True identified the disabled van as "M11," and at trial, he recounted inspecting it with William Stryker, a police officer for the city of Everett. Neither of them immediately noticed the damage to the lock. When they looked inside the vehicle, True confirmed that they didn't notice anything "amiss" within the vehicle. Stryker then "pressed the interior lock button on [the] passenger door" and closed the door, still without noticing the lock was damaged. The two did not notice the broken lock until a second inspection minutes later. Specifically, the lock on the passenger door was "punched out or had been messed with and it was disabled," resulting in an inability to lock the door.

To True's knowledge, nothing was reported missing or stolen from the vehicle. True testified that the driver assigned to drive the van had driven it earlier that day for eight and a half hours and parked it in the lot around 11:30 p.m. True testified that it was likely the driver would have noticed if the doors were "broken and not locking" and in that type of situation, employees would "report it" to their supervisor. True confirmed that there was no report of damage "from this driver when he dropped" off the van. Finally, upon "scop[ing] out the fence line with" the police, True recalled that a portion of the fencing along the lot was disturbed, noting that the "bottom ties had been removed and the chain link had been bowed." When asked if there had "been enough room for maybe you to make your way under the fence," True testified that "I could get under it."

Also among the approximately ten Everett police officers who responded to the scene were Officer Mason Pistole and student Officer Peter Heaukulani. According to Pistole, he approached the lot from Kasch Park Road, which "runs west to east" and is

3

"directly north" of the lot. As he turned onto Kasch Park Road, he saw a person "wearing a white sun hat, dark clothing, and a backpack." Pistole got out of his patrol car, activated his body camera, approached the individual, and asked him to sit on the curb. The person complied and provided his name and date of birth. In court, Pistole identified the person as Xiong.

During the initial exchange with Pistole, Xiong denied walking through the lot but later admitted he "cut through" it as a short cut to "4th and Harrison." Pistole testified that another officer detained a separate individual suspect, but he did not know the outcome of that detention. Heaukulani also spoke with Xiong and subsequently searched his backpack. Inside the backpack, he found an assortment of tools, including "multiple screwdrivers of various sizes," pliers, and a wrench. A different officer also assisted in the search of Xiong's backpack and found Ford car keys.

True testified that he could not test the keys on the disabled lock because it was broken, but when he tested the keys in other locks on M11, they were not a match. The keys also did not work on the school district maintenance vehicles. Heaukulani testified the keys were not shaved or altered, and there was no indication that they were "anything other than ordinary car keys."

At trial, Stryker recounted how he discovered the broken lock. He testified to his experience investigating vehicle thefts and how common it is to find broken locks during his investigations. He explained that the lock on the van looked "tampered with because the keyhole [wa]sn't vertical. It[ was] actually kind of crooked to the side, and it look[ed] like it[ had] been blown out." Stryker described that this damage resembled a "punched lock," which is "essentially a lock that has been punched out or more space has been

made in that lock to fit something, typically using some kind of tool or other implement."

When asked what kinds of tools somebody could use to punch a lock, he responded,

> All kinds of stuff. I've seen . . . the back of a hammer, . . . knitting or sewing needles, nails, screwdrivers, to flatheads, knife blades, anything that can kind of get into the keyhole that a regular fitting key should go into, and then try to make more space for that or bust the whole lock out completely.

Stryker further explained that punching a lock can "defeat" the lock so it "no longer works as it should" because it widens or opens the lock "enough to fit another object inside to try to trip whatever else is inside the lock to allow that thing to be unlocked." He confirmed that the lock on M11 looked like it had been punched out and that the items found in Xiong's bag could have caused the damage. Finally, he testified that in prior vehicle prowling investigations, he had also seen people attempt to use mismatched keys on punched locks because "people use the same manufacturer to try to access a similar lock [since] manufacturing processes are the same." Thus, because a punched lock allows for "more wiggle room," it allows "for a similar but mismatched key to unlock the door." Stryker confirmed that M11 was one of the vans seen in the six-second surveillance video that was submitted as a trial exhibit.

The State charged Xiong with burglary in the second degree. The jury convicted Xiong as charged. The court sentenced Xiong to a prison-based Drug Offender Sentencing Alternative (DOSA) sentence of 29.75 months in custody followed by 29.75 months on community custody. Xiong timely appeals.

5

DISCUSSION

Xiong contends that there was insufficient evidence to convict him of burglary in the second degree because the State failed to present evidence sufficient "to prove he committed or attempted to commit a theft while in the lot." We disagree.

Due process requires the State to prove every element of a crime beyond a reasonable doubt. State v. Johnson, 188 Wn.2d 742, 750, 399 P.3d 507 (2017). To determine whether sufficient evidence supports a conviction, an appellate court must consider " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." State v. Zghair, 4 Wn.3d 610, 619-20, 567 P.3d 1 (2025) (emphasis omitted) (quoting Jackson v. Virginia, 443 U.S. 307, 318-19 (1979)). A claim of insufficient evidence admits the truth of the State's evidence and all reasonable inferences from that evidence. State v. Salinas, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All reasonable inferences must be interpreted in favor of the State and most strongly against the defendant. Id. Circumstantial and direct evidence are equally reliable. State v. Lazcano, 188 Wn. App. 338, 363, 354 P.3d 233 (2015). Whether sufficient evidence supports a defendant's conviction is a question of law reviewed de novo. State v. Rich, 184 Wn.2d 897, 903, 365 P.3d 746 (2016).

The State charged Xiong with burglary in the second degree. "A person is guilty of burglary in the second degree if, with intent to commit a crime against a person or property therein, he or she enters or remains unlawfully in a building other than a vehicle or a dwelling." RCW 9A.52.030(1). A "building" includes a "fenced area." RCW

9A.04.110(5).[1] Xiong concedes that it was undisputed that he trespassed through the school district lot. Accordingly, the only question is whether the State presented sufficient evidence that Xiong did so with intent to commit a crime.

Citing State v. Vasquez, Xiong argues that the State's evidence is insufficient because "the evidence fails to show the accused's ' "conduct that plainly indicates such intent as a matter of logical probability." ' " 178 Wn.2d 1, 14, 309 P.3d 318 (2013) (quoting State v. Bergeron, 105 Wn.2d 1, 20, 711 P.2d 1000 (1985)). Xiong explains that the State's evidence "does not show, as a matter of logical probability, that [he] entered the lot because he wanted to commit a crime . . . . Instead, the patently equivocal evidence, at best, shows such a conclusion is merely plausible." This is so, he contends, because the State failed to: establish when the lock was punched out, establish when the last inspection of M11 had taken place given the difficulty in discovering the broken lock, present toolmark analysis to connect Xiong's tools with the punched lock, prove that Xiong had stolen anything from M11, or eliminate the possibility that the other individual detained that evening damaged the lock or that the lock was damaged the evening before when the alarm was disarmed. However, his reliance on Vasquez is misplaced.

In Vasquez, a defendant appealed his conviction for two counts of forgery after a security guard confronted him for shoplifting and found him in possession of a forged social security card and a forged permanent resident card. 178 Wn.2d at 4-5. Vasquez

---

[1] The State also cites to RCW 9A.52.040, which states that "[i]n any prosecution for burglary, any person who enters or remains unlawfully in a building may be inferred to have acted with intent to commit a crime against a person or property therein, unless such entering or remaining shall be explained by evidence satisfactory to the trier of fact to have been made without such criminal intent." RCW 9A.52.040. However, the jury was not instructed on this statute. Thus, it is irrelevant to this analysis.

argued that the State presented insufficient evidence to support the determination that he possessed the cards with the intent to injure or defraud, which is an essential element of the forgery statute. Id. at 4. The Court of Appeals affirmed his convictions, reasoning that there was no other reason to have the cards except to falsely represent his right to legally be in the country, and that some testimony insinuated that the defendant used the cards to falsely represent his right to legally work in the country, thus permitting a jury to make an inference based on the facts and circumstances as to the defendant's intent "as a matter of logical probability." Id. at 13, 16.

The Washington Supreme Court disagreed and held that the State failed to meet its burden. Id. at 17. First, it reasoned that bare possession does not support an inference of intent to injure or defraud and explained that the Court of Appeals' determination "whisk[ed] away" the State's burden to prove intent. Id. at 12-13. Second, it reasoned that it could not infer criminal intent given the equivocal nature of the testimony provided at trial. Id. at 14. From the record, it was unclear whether the defendant intended to convince the security guard that the cards were genuine when the guard removed them from the defendant's wallet and asked about them. Id. Finally, the court disagreed that a jury could reasonably infer based on the circumstantial evidence presented at trial that the defendant had sought work, was working, or planned to work in the area. Id. at 17. All that the State presented at trial was the security officer's equivocal comments that the defendant mentioned he worked in the area, although he also clarified he could not remember exactly what the defendant said. Id. Otherwise, the defendant specified he was not currently working when filling out forms. Id. Even assuming the defendant was employed, no evidence indicated the

8

forged cards were used to obtain employment. Id. Thus, the argument was inappropriately reliant on speculation rather than reasonable inferences.

Here, by contrast, the State carried its burden. Unlike the minimal and equivocal nature of the evidence presented in Vasquez, the evidence here was sufficient for a rational trier of fact to reasonably infer Xiong intended to commit a crime against a person or property in the school district lot. Video surveillance footage showed a person emerging from between a group of vans on the property. Stryker confirmed that M11, the van that had its lock "punched out," was in that general group. True also confirmed that the driver of the van had not reported any damage to the vehicle and had apparently driven it shortly before it was discovered that one of its locks was damaged.

Officers found Xiong on a road nearby shortly after the silent alarm was activated, and the apparel Xiong was wearing matched the apparel of the individual from the video surveillance footage. When officers searched Xiong's backpack, they found multiple tools that Stryker testified could be used to cause the type of damage observed on M11's lock. Furthermore, the State presented evidence that Xiong was carrying keys with a Ford logo, the same make as the M11. Although it did not work on M11's locks and was not apparently a "shaved" key, Stryker's testimony elaborated that keys of a similar make were commonly used in punched locks to make opening the locks easier.

Accordingly, when viewing the evidence in a light most favorable to the State and drawing reasonable inferences from that evidence, any rational factfinder could have found Xiong intended to commit a crime against person or property when he entered the school district lot.

CONCLUSION

We affirm.

_Chung, J._

WE CONCUR:

_Birk, J._